| | | | |
|---|---|---|---|
| | | Contracts) ............ | M ......... |
| FAR 52.246-25 .. | FAR 46.805(a-)(4) ....... | Limitation of Liability-Services .... | M ......... |
| 1652.246-70 ......... | 1646.301 | FEHBP Inspection ........ | M ......... |
| FAR 52.247-63 .. | FAR 47.405 ... | Preference for U.S.-Flag Air Carriers .......... | M ......... |
| 1652.249-70 ...... | 1649.101-70 | Renewal and Withdrawal of Approval ........... | M ......... |
| FAR 52.251-1 ... | FAR 51.107 ... | Government Supply Sources ................ | A ......... |
| FAR 52.252-2 ... | FAR 52.107(b) | Clauses Incorporated by Reference ............. | M ......... |
| FAR 52.252-4 ... | FAR 52.107(d) | Alterations in Contract . | M ......... |
| FAR 52.252-6 ... | FAR 52.107(f) | Authorized Deviations in Clauses ............... | M ......... |

1...+...10....+...20....+...30....+...40....+...50....+...60....+...7

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*******************************************************************************
******* This is piece 2. -- It begins at character 70 of table line 1. ********
*******************************************************************************

| Use with contracts based on | |
|---|---|
| Cost analysis | Price analysis |
| T ........... | T |
| T ........... | T |
| T ........... | T |
| T ........... | T |
| T ........... | T |
| T ........... | T |
| T ........... | T |
| T ........... | T |
| T ........... | T |
| T ........... | T |
| T ........... | --------- |
| ----------- | T |
| T ........... | --------- |
| ----------- | T |
| T ........... | --------- |
| T ........... | --------- |

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

55 FR 27406-01
**(Cite as: 55 FR 27406, *27418)**

----------- T
T ........... ---------

----------- T

T ........... ---------

T ........... T

T ........... T

T ........... T
T ........... T

T ........... T
T ........... T

T ........... T

T ........... T

T ........... T

T ........... T

T ........... T
T ........... T
T ........... T

T ........... T

----------- T

T ........... ---------

T ........... T

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

T ........... T

T ........... T

T ........... T

T ........... T

T ........... T

----------- T

T ........... T

T ........... T

T ........... T

T ........... ---------

T ........... T
T ........... T

T ........... ---------

T ........... t
T ........... T

T ........... T

T ........... T

T ........... ---------
T ........... T

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

```
T ........... T

T ........... T

T ...........  ---------

T ........... T
T ........... T

T ........... T
--------------------------
70..+...80....+...90....+
```

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

55 FR 27406-01
**(Cite as: 55 FR 27406, *27418)**

[FR Doc. 90-15016 Filed 6-29-90; 8:45 am]

BILLING CODE 6325-01-M

55 FR 27406-01, 1990 WL 334151 (F.R.)
END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

# CONTRACT FOR FEDERAL EMPLOYEES HEALTH BENEFITS

| | | |
|---|---|---|
| **CONTRACT NO:** | **CS 1894** | **ORIGINAL CONTRACT** |
| **EFFECTIVE:** | **01-01-2000** | **EFFECTIVE: 01-01-1999** |

***BETWEEN:*** **THE UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
***hereinafter called the OPM, the Agency, or the Government***

**AND**

**CONTRACTOR:** **TEXAS HEALTH CHOICE, L.C.**
- ***hereinafter also called the Carrier.***

**Address:** **TEXAS HEALTH CHOICE, L.C.**
**9330 AMBERTON PARKWAY**
**DALLAS, TEXAS 75243**

**In consideration of payment by the Agency of subscription charges set forth in Appendix B, the Carrier agrees to perform all of the services set forth in this contract, including Appendix A.**

| **FOR THE CARRIER** | **FOR THE GOVERNMENT** |
|---|---|
| PHYLLIS BRASHER | **David A. Lewis** |
| **Name of Person Authorized to Execute contract (*Type or print*)** | **Name of Contracting Officer (*Type or print*)** |
| Vice-President, Legal & Govn't Affairs | **Chief, Insurance Contracts Division III** |
| ***Title*** | ***Title*** |
| [signature] | David A. Lewis [signature] |
| ***Signature*** | ***Signature*** |
| 12/20/99 | 5/2/00 |
| ***Date Signed*** | ***Date Signed*** |

# Year 2000 Amendments to the Standard Contract for Community-Rated Carriers

1. Add new Sections 1.23, NOTICE TO ENROLLEES ON TERMINATION OF FEHBP OR PROVIDER CONTRACT, and 1.24, TRANSITIONAL CARE, to implement the continuity of care provisions of the Patients' Bill of Rights, as follows:

SECTION 1.23
NOTICE TO ENROLLEES ON TERMINATION OF FEHBP OR PROVIDER CONTRACT (JAN 2000)

(a) Enrollees who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy at the time a carrier terminates (1) all or part of its FEHBP contract, or (2) the enrollee's specialty provider contract for reasons other than cause, may be able to continue to see their specialty provider for up to 90 days or through their postpartum care.

(b) The Carrier shall notify its enrollees in writing of its intent to terminate all or part of its FEHBP contract, including service area reductions, or the enrollees' specialty provider contract, for reasons other than cause in order to allow sufficient time for the enrollees to arrange for continued care after the 90-day period. The Carrier shall send the notice in time to ensure it is received by the enrollees no less than 90 days prior to the date it terminates the contract, unless the Carrier demonstrates it was prevented from doing so for reasons beyond its control. The Carrier's prompt notice will ensure that the notification period and the transitional care period run concurrently.

SECTION 1.24
TRANSITIONAL CARE (JAN 2000)

(a) Transitional care is specialized care provided for up to 90 days or through the postpartum period to an enrollee undergoing treatment for a chronic or disabling condition or who is in the second or third trimester of pregnancy when his or her carrier terminates (1) all or part of its FEHBP contract, or (2) the enrollee's specialty provider contract for reasons other than cause. The 90-day period begins the earlier of the date the enrollee receives the notice required under Section 1.23, Notice to Enrollees on Termination of FEHBP or Provider Contract, or the date the Carrier's or the provider's contract ends.

(b) Beginning January 1, 2000, the Carrier shall ensure the following:

(1) *If it terminates a part of its FEHB contract or a specialty provider contract* other than for cause, it allows enrollees who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy to continue treatment under the specialty provider for up to 90 days, or through their postpartum period, under the same terms and conditions that existed at the beginning of the transitional care period; and

(2) *If it enrolls a new member who involuntarily changed carriers because the enrollee's former carrier was no longer available in the FEHB Program*, it provides transitional care for the enrollee if he or she is undergoing treatment for a chronic or disabling condition or is in the second or third trimester of pregnancy for up to 90 days, or through the postpartum period, under the same terms and conditions the enrollee had under the prior carrier.

(c) In addition, the Carrier shall (1) pay for or provide the transitional care required under this clause at no additional cost to enrollees;

(2) require the specialty provider to promptly transfer all medical records to the designated new provider during or upon completion of the transition period, as authorized by the patient; and,

(3) require the specialty provider to give all necessary information to the Carrier for quality assurance purposes.

2. Add a new clause 2.14, CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER, to reinforce certain existing contractual requirements as follows:

SECTION 2.14
CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER (JAN 2000)

(a) The Carrier shall fulfill all of the requirements agreed to under the contract that continue after termination. The order of precedence for the

applicable laws, regulations, and the contract are listed in Section 1.3.

(b) Contract requirements that extend beyond the date of the Carrier's termination include, but are not limited to, offering conversion contracts to enrollees during the 31-day extension of coverage for conversion, providing benefits to the enrollee until the effective date of the new enrollment, and processing and paying claims incurred prior to the termination date.

3. Redate Section 3.2, ACCOUNTING AND PRICE ADJUSTMENT, as JAN 2000; add a new paragraph (c) to conform to the DoD Demonstration Project interim regulations published on July 6, 1999, as follows:

SECTION 3.2
ACCOUNTING AND PRICE ADJUSTMENT (JAN 2000) (FEHBAR 1652.216-70)

(a) *Annual Accounting Statement.* The Carrier, not later than 90 days after the end of each contract period, shall furnish to OPM for that contract period an accounting of its operations under the contract. The accounting shall be in the form prescribed by OPM.

(b) *Adjustment.* (1) This contract is community rated as defined in FEHBAR 1602.170-2.

(2) The subscription rates agreed to in this contract shall be equivalent to the subscription rates given to the Carrier's similarly sized subscriber groups (SSSGs) as defined in FEHBAR1602.170-13.

(3) If, at the time of the rate reconciliation, the subscription rates are found to be lower than the equivalent rates for the lower of the two SSSGs, the Carrier may include an adjustment to the Federal group's rates for the next contract period.

(4) If, at the time of the rate reconciliation, the subscription rates are found to be higher than the equivalent rates for the lower of the two SSSGs, the Carrier shall reimburse the Fund, for example, by reducing the FEHB rates for the next contract term to reflect the difference between the estimated rates and the rates which are derived using the methodology of the lower rated SSSG.

(5) No upward adjustment in the rate established for this contract will be allowed or considered by the Government or will be made by the Carrier in this or in any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size or composition of the FEHBP group during this contract period.

(6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

(c) <u>*Exception for the 3-Year DoD Demonstration Project (10 U.S.C. 1108).*</u> Similarly sized subscriber group (SSSG) rating methodologies shall not be used to determine the reasonableness of the Carrier's demonstration project premium rates. The Carrier's rates shall not be adjusted for equivalency with SSSG rating methodologies. The Carrier shall benchmark premiums against adjusted community rates if available, Medigap offerings, or other similar products.

(End of Clause)

4. Redate Section 3.3, RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (FEHBAR 1652.215-70), as JAN 2000; add a new paragraph (d) to to conform to the DoD Demonstration Project interim regulations published on July 6, 1999, as follows:

SECTION 3.3
RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (JAN-2000) (FEHBAR 1652.215-70)

(a) If any rate established in connection with this contract was increased because (1) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not complete, accurate, or current as certified in the Certificate of Accurate Cost or Pricing Data (FEHBAR 1615.804-70); (2) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not accurate as represented in the rate proposal documents; (3) the Carrier developed FEHBP rates with a rating methodology and structure inconsistent with that used to develop rates for similarly sized subscriber groups (see FEHBAR §1602.170-13) as certified in the Certificate of Accurate Cost or Pricing Data for Community Rated Carriers; or (4) the Carrier submitted or kept in its files in support of the FEHBP rate, data or information of any description that were not complete, accurate, and current--then, the rate shall be reduced in the amount by which the price was

increased because of the defective data or information.

(b)(1) If the Contracting Officer determines under paragraph (a) of this clause that a price or cost reduction should be made, the Carrier agrees not to raise the following matters as a defense: (i) The Carrier was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current cost or pricing data had been submitted or maintained and identified.

(ii) The Contracting Officer should have known that the cost or pricing data in issue were defective even though the Carrier took no affirmative action to bring the character of the data to the attention of the Contracting Officer.

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract.

(iv) The Carrier did not submit or keep in its files a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (b)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if--

(A) The Carrier certifies to the Contracting Officer that, to the best of the Carrier's knowledge and belief, the Carrier is entitled to the offset in the amount requested; and

(B) The Carrier proves that the cost or pricing data were available before the date of agreement on the price of the contract (or price of the modification) and that the data were not submitted before such date.

(ii) An offset shall not be allowed if—

(A) The understated data was known by the Carrier to be understated when the Certificate of Current Cost or Pricing Data was signed; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the date of agreement on price.

(c) When the Contracting Officer determines that the rates shall be reduced and the Government is thereby entitled to a refund, the Carrier shall be liable to and shall pay the FEHB Fund at the time the overpayment is repaid--

(1) Simple interest on the amount of the overpayment from the date the overpayment was paid from the FEHB Fund to the Carrier until the date the overcharge is liquidated. In calculating the amount of interest due, the Carrier shall use the quarterly rate determinations by the Secretary of the Treasury under the authority of 26 U.S.C. 6621(a)(2) applicable to the periods the overcharge was retained by the Carrier shall be used; and,

(2) A penalty equal to the amount of overpayment, if the Carrier knowingly submitted cost or pricing data which was incomplete, inaccurate, or noncurrent.

(d) _Exception for the DoD Demonstration Project._ Similarly sized subscriber group (SSSG) rating methodologies shall not be used to determine the reasonableness of the Carrier's demonstration project premium rates. The Carrier's rates shall not be adjusted for equivalency with SSSG rating methodologies. The Carrier shall benchmark premiums against adjusted community rates if available, Medigap offerings, or other similar products.

(End of Clause)

5. Redate Section 3.7, SURVEY CHARGES, as JAN 2000 and add amended language as follows:

SECTION 3.7
SURVEY CHARGES (JAN 2000)

(a) If the Carrier participates in an FEHB annual consumer assessment survey, it shall pay OPM's contractor a pro rata share of the total cost of consolidating and reporting the survey results to OPM. The Carrier shall pay a separate fee for each plan option and /or rating area. The Carrier agrees to pay the contractor's invoice within 30 days of the billing date. If the Carrier does not remit payment to the contractor within 60 days of the billing date, OPM shall withhold the amount due from the Carrier's subscription charges according to FEHBAR 1652.232-70, Payments–community-rated contracts, and forward payment to the contractor.

(b) Costs incurred by the Carrier for contracting with a vendor to conduct the survey shall be the Carrier's responsibility.

6. For carriers participating in the 3-year DoD Demonstration Project only, add a new clause under Section 4.1, entitled PARTICIPATION IN THE DoD DEMONSTRATION PROJECT, to implement the joint DoD/FEHBP Demonstration Project authorized by 10 U.S.C. 1108, as follows:

(CR-2000)

For carriers participating in the 3-Year DoD Demonstration Project only:

SECTION 4.1
PARTICIPATION IN DoD/FEHBP DEMONSTRATION PROJECT
(JAN 2000)

(a) The Carrier shall participate in the DoD/FEHBP Demonstration Project authorized by 10 U.S.C. 1108 ("DoD Demonstration Project") under the terms and conditions specified by OPM.

(b) In setting the premium rate, the Carrier shall comply with the requirements in Section 3.2, Accounting and Price Adjustment (FEHBAR 1652.216-70), and 3.3, Rate Reduction for Defective Pricing or Defective Cost or Pricing Data (FEHBAR 1652.215-70).

(c) If the Carrier has experienced costs far in excess of the premiums for the DoD enrollment group, OPM will reimburse the Carrier first from the Carrier's demonstration project Contingency Reserve and then from OPM's Administrative Reserve. At the end of the demonstration project, any surplus will be placed in the Contingency Reserve of all carriers continuing in the FEHB Program following the termination of the DoD demonstration project. Credit will be in proportion to the amount of subscription charges paid and accrued to the carriers' plan during the final year of the demonstration project.

(d) The Carrier shall compile, maintain, and, when requested by OPM, report data on the plan's experience to produce reports containing the following information and analysis:

(1) The number of eligible beneficiaries who elect to participate in the demonstration project.

(2) The number of eligible beneficiaries who elected to participate in the demonstration project and did not have Medicare Part B coverage before electing to participate.

(3) The costs of health benefits charges and the costs (direct and indirect) of administering the benefits and services provided to eligible beneficiaries who elect to participate in the demonstration project as compared to similarly situated enrollees in the FEHB Program.

(4) Prescription drug costs for demonstration project beneficiaries.

7. Update the introductory paragraph and paragraph (a)5. of Appendix D-a to include website material under supplemental literature, as follows:

APPENDIX D-a
FEHB SUPPLEMENTAL LITERATURE GUIDELINES

This is the primary guide a Carrier should use to assess whether the Carrier's supplemental marketing literature, including website material, complies with FEHBAR 1603.70, Misleading, Deceptive or Unfair Advertising. (Use the NAIC Guidelines for additional guidance when needed.)

a) 5. Under the FEHBP, the FEHB brochure is based on text approved by OPM and is a complete statement of benefits, limitations, and exclusions. Include the following statement (website material should include the statement as a preface) in all supplemental literature which in any way discusses Plan benefits:

*"This is a summary [or brief description] of the features of the [insert Plan's name]. Before making a final decision, please read the Plan's Federal brochure ([insert brochure number]). All benefits are subject to the definitions, limitations, and exclusions set forth in the Federal brochure.*

(CR-2000)

# FEDERAL EMPLOYEES HEALTH BENEFITS PROGRAM

## *STANDARD CONTRACT*

## *FOR*

## *COMMUNITY-RATED HEALTH MAINTENANCE ORGANIZATION CARRIERS*

# 2000

(CR-2000)

(CR-2000)

(INSERT SIGNATURE PAGE OF CONTRACT)

# TABLE OF CONTENTS

This is a community-rated contract for the Health Maintenance Organization Carrier and consists of the cover page, the table of contents and the provisions, clauses and appendices as included in PARTS 1 through 6.

PART I - GENERAL PROVISIONS


1.1 DEFINITIONS OF FEHB TERMS
1.2 ENTIRE CONTRACT
1.3 ORDER OF PRECEDENCE
1.4 INCORPORATION OF LAWS AND REGULATIONS
1.5 RECORDS AND INFORMATION TO BE FURNISHED BY OPM
1.6 CONFIDENTIALITY OF RECORDS (FEHBAR)
1.7 STATISTICS AND SPECIAL STUDIES
1.8 NOTICE
1.9 FEHB QUALITY ASSURANCE
1.10 NOTICE OF SIGNIFICANT EVENTS (FEHBAR)
1.11 FEHB INSPECTION (FEHBAR)
1.12 CORRECTION OF DEFICIENCIES
1.13 INFORMATION AND MARKETING MATERIALS
1.14 MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (FEHBAR)
1.15 RENEWAL AND WITHDRAWAL OF APPROVAL (FEHBAR)
1.16 [RESERVED]
1.17 NOVATION AGREEMENT (FEHBAR)
1.18 AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (FEHBAR)
1.19 CERTIFICATION UNDER P.L. 104-191 (HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996)
1.20 PATIENTS' BILL OF RIGHTS
1.21 [RESERVED]
1.22 HIPAA COMPLIANCE
1.23 NOTICE TO ENROLLEES ON TERMINATION OF FEHBP OR PROVIDER CONTRACT
1.24 TRANSITIONAL CARE


PART II - BENEFITS


2.1 ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT
2.2 BENEFITS PROVIDED
2.3 PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES
2.4 TERMINATION OF COVERAGE AND CONVERSION PRIVILEGES
2.5 SUBROGATION
2.6 COORDINATION OF BENEFITS (FEHBAR)
2.7 DEBARMENT AND OTHER SANCTIONS
2.8 FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS
2.9 PROTECTION OF MEMBERS AGAINST PROVIDER CLAIMS
2.10 INDEPENDENT LABORATORIES
2.11 CLAIMS PROCESSING
2.12 CALCULATION OF COST SHARING PROVISIONS
2.13 BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY
2.14 CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER


PART III - PAYMENTS, CHARGES AND ACCOUNTING


3.1 PAYMENTS (FEHBAR)
3.2 ACCOUNTING AND PRICE ADJUSTMENT (FEHBAR)
3.3 RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (FEHBAR)
3.4 CONTRACTOR RECORDS RETENTION (FEHBAR)
3.5 APPROVAL FOR THE ASSIGNMENT OF CLAIMS (FEHBAR)
3.6 DISCREPANCIES BETWEEN ENROLLMENT AND PAYMENTS TO CARRIER
3.7 SURVEY CHARGES

## PART IV - SPECIAL PROVISIONS

4.1 ALTERATIONS IN CONTRACT (FAR)

## PART V - STANDARD CLAUSES

This contract shall include all of the following standard clauses required by the Federal Acquisition Regulation (FAR) or Federal Employees Health Benefits Acquisition Regulation (FEHBAR).

5.1 DEFINITIONS
5.2 [RESERVED]
5.3 GRATUITIES
5.4 COVENANT AGAINST CONTINGENT FEES
5.5 ANTI-KICKBACK PROCEDURES
5.6 [RESERVED]
5.7 AUDIT AND RECORDS-NEGOTIATION
5.8 thru 5.13 [RESERVED]
5.14 UTILIZATION OF SMALL BUSINESS CONCERNS
5.15 [RESERVED]
5.16 [RESERVED]
5.17 CONVICT LABOR
5.18 CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-OVERTIME COMPENSATION
5.19 EQUAL OPPORTUNITY
5.20 [RESERVED]
5.21 NOTIFICATION OF VISA DENIAL
5.22 AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA
5.23 AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES
5.24 CLEAN AIR AND WATER
5.25 DRUG FREE WORKPLACE
5.26 FEDERAL, STATE, AND LOCAL TAXES
5.27 [RESERVED]
5.28 TAXES-CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO
5.29 TAXES - FOREIGN NEGOTIATED BENEFITS CONTRACTS (JAN 1998) (FEHBAR 1652.229-70)
5.30 COST ACCOUNTING STANDARDS
5.31 DISCLOSURE AND CONSISTENCY OF COST ACCOUNTING PRACTICES
5.32 ADMINISTRATION OF COST ACCOUNTING STANDARDS
5.33 DISCOUNTS FOR PROMPT PAYMENT
5.34 INTEREST (FEHBAR MODIFICATION OF FAR)
5.35 ASSIGNMENT OF CLAIMS
5.36 DISPUTES
5.37 [RESERVED]
5.38 CHANGES--NEGOTIATED BENEFITS CONTRACTS
5.39 [RESERVED]
5.40 GOVERNMENT PROPERTY (NEGOTIATED BENEFITS CONTRACTS)
5.41 [RESERVED]
5.42 PREFERENCE FOR U.S.-FLAG AIR CARRIERS
5.43 [RESERVED]
5.44 AUTHORIZED DEVIATIONS IN CLAUSES
5.45 LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS
5.46 [RESERVED]
5.47 PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED OR PROPOSED FOR DEBARMENT
5.48 BANKRUPTCY
5.49 FEHBP TERMINATION FOR CONVENIENCE OF THE GOVERNMENT--NEGOTIATED BENEFITS CONTRACTS
5.50 FEHBP TERMINATION FOR DEFAULT--NEGOTIATED BENEFITS CONTRACTS
5.51 [RESERVED]
5.52 [RESERVED]
5.53 NOTICE TO THE GOVERNMENT OF LABOR DISPUTES
5.54 [RESERVED]
5.55 EMPLOYMENT REPORTS ON DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA
5.56 AUTHORIZATION AND CONSENT

5.57 NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT
5.58 PAYMENT BY ELECTRONIC FUNDS TRANSFER—CENTRAL CONTRACTOR REGISTRATION
5.59 PROHIBITION OF SEGREGATED FACILITIES

PART VI -- APPENDICES

A- BROCHURE TEXT
B- SCHEDULE OF RATES, CHARGES AND LIMITATIONS
C- CONTRACT ADMINISTRATION DATA
D- (a) FEHBP SUPPLEMENTAL LITERATURE GUIDELINES JANUARY 2000; (b) ADVERTISEMENTS OF ACCIDENT AND SICKNESS INSURANCE MODEL REGULATION (1999)
E- ORDER OF BENEFIT DETERMINATION RULES, GROUP COORDINATION OF BENEFITS REGULATION, MODEL REGULATION SERVICE - JANUARY 1996, NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS

# PART I - GENERAL PROVISIONS

SECTION 1.1
DEFINITIONS OF FEHB TERMS (JAN 1997)
For purpose of this contract, the following definitions apply:

FEHBP: Federal Employees Health Benefits Program.
Enrollee: The Federal employee, annuitant, former spouse, temporarily-covered former Federal employee or dependent, enrolled under this contract.
Member: The Enrollee and/or an eligible dependent for benefit purposes, and sometimes referred to as subscriber.
Act: The Federal Employees Health Benefits Act, as amended; chapter 89 of title 5, United States Code.
Regulations: (1) The Federal Employees Health Benefits Regulations; part 890, title 5, Code of Federal Regulations, and (2) chapters 1 and 16 of title 48, Code of Federal Regulations.
Benefits: Covered services or payment for covered services set forth in Appendix A, to which Members are entitled to the extent provided by this contract.
Carrier: As defined by chapter 89 of title 5, United States Code, and may be used interchangeably with the term Contractor.
Subcontractor: Any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime contractor, or another subcontractor, except for providers of direct medical services or supplies pursuant to the Carrier's health benefits plan.

SECTION 1.2
ENTIRE CONTRACT (JAN 1996)

(a) This document as described in the Table of Contents constitutes the entire contract between the parties. No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this contract. All modifications to the contract must be made in writing by the duly authorized Contracting Officer.

(b) All statements concerning coverage or benefits made by OPM, the Carrier or by any individual covered under this policy shall be deemed representations and not warranties. No such statement shall convey or void any coverage, increase or reduce any benefits under this policy or be used in the prosecution of or defense of a claim under this policy unless it is contained in writing and a copy of the instrument containing the statement is or has been furnished to the Member or to the person making the claim.

SECTION 1.3
ORDER OF PRECEDENCE (JAN 1996)

Any inconsistency in this contract shall be resolved by giving precedence in the following descending order: The Act, the regulations in part 890, title 5, Code of Federal Regulations, the regulations in chapters 1 and 16, title 48, Code of Federal Regulations, and this contract.

SECTION 1.4
INCORPORATION OF LAWS AND REGULATIONS (JAN 1996)

(a) The applicable provisions of (1) chapter 89 of title 5, United States Code; (2) OPM's regulations as contained in part 890, title 5, Code of Federal Regulations; and (3) chapters 1 and 16 of title 48, Code of Federal Regulations constitute a part of this contract as if fully set forth herein, and the other provisions of this contract shall be construed so as to comply therewith.

(b) If the Regulations are changed in a manner which would increase the Carrier's liability under this contract, the change will be made effective for the contract period subsequent to the period in which the change is promulgated and, if the change is promulgated in November or December, the change will not be effective until the second contract year following the year in which the change is promulgated; unless (i) The Carrier agrees to an earlier date or (ii) the change is ordered by the Contracting Officer pursuant to the *Changes--Negotiated Benefits Contracts* clause of the contract.

SECTION 1.5
RECORDS AND INFORMATION TO BE FURNISHED BY OPM (JAN 1997)

(a) The OPM shall maintain or cause to be maintained records from which may be determined the names and social security numbers of all Enrollees. Such information shall be furnished to the Carrier by the OPM, or other agencies of the Federal Government, at such times and in such form and detail as will enable the Carrier to maintain a currently accurate record of all Enrollees.

(b) The OPM shall direct the agencies to provide the Carrier, not less often than quarterly, the names of Enrollees enrolled under the contract by payroll office and the premium paid for those Enrollees for the current pay cycle. The Carrier shall at least quarterly reconcile its enrollment records with those provided by the Government.

(c) Neither clerical error (whether by the OPM, by any other Government agency, or by the Carrier) in keeping any records pertaining to coverage under this contract, nor delays in making entries thereon, nor failure to make or account for any deduction of enrollment charges, shall invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated. If any relevant facts pertaining to any individual to whom coverage under this contract relates shall be found to have been misstated, and if such misstatement affects the existence or the amount or extent of coverage, the true facts shall be used in determining whether coverage is in force under the terms of this contract.

SECTION 1.6
CONFIDENTIALITY OF RECORDS (JAN 1991) (FEHBAR 1652.224-70)

(a) The Carrier shall use the personal data on employees and annuitants that is provided by agencies and OPM, including social security numbers, for only those routine uses stipulated for the data and published annually in the Federal Register as part of OPM's notice of systems of records.

(b) The Carrier shall also hold all medical records, and information relating thereto, of Federal subscribers confidential except as follows:

(1) As may be reasonably necessary for the administration of this contract;

(2) As authorized by the patient or his or her guardian;

(3) As disclosure is necessary to permit Government officials having authority to investigate and prosecute alleged civil or criminal actions;

(4) As necessary to audit the contract;

(5) As necessary to carry out the coordination of benefit provisions of this contract; and

(6) For bona fide medical research or educational purposes. Release of information for medical research or educational purposes shall be limited to aggregated information of a statistical nature that does not identify any individual by name, social security number, or any other identifier unique to an individual.

(c) If the Carrier uses medical records for the administration of the contract, or for bona fide research or educational purposes, it shall so state in the Plan's brochure.

SECTION 1.7
STATISTICS AND SPECIAL STUDIES (JAN 1999)

(a) The Carrier shall maintain or cause to be maintained statistical records of its operations under the contract and shall furnish OPM, in the form prescribed by the Contracting Officer, the statistical reports reasonably necessary for the

OPM to carry out its functions under Section 1308 and Chapter 89 of title 5, United States Code.

(b) The Carrier shall furnish such other reasonable statistical data and reports of special studies as the Contracting Officer may from time to time request for the purpose of carrying out its functions under Chapter 89 of title 5, United States Code.

(c) The Carrier shall furnish the routine reports in the required number of copies to the addresses specified in Appendix C, *Contract Administration Data.*

(d) The Carrier shall notify the OPM Contract Representative immediately upon a change in the name or address of the Carrier's contract administrator(s).

SECTION 1.8
NOTICE (JAN 1991)

Where the contract requires that notice be given to the other party, such notice shall be given in writing to the address specified in Appendix C, *Contract Administration Data.*

SECTION 1.9
FEHB QUALITY ASSURANCE (JAN 1999)

(a) The Carrier shall develop and apply a quality assurance program specifying procedures for assuring contract quality. At a minimum the program must include procedures to address:

(1) Accuracy of Payments.

(i) Processing Accuracy - the number of FEHB claims processed accurately divided by the total number of FEHB claims processed for the given time period, expressed as a percentage.

REQUIRED STANDARD: An average of 95 percent of FEHB claims must be processed accurately.

(ii) COB Processing - the Carrier must demonstrate that a statistically valid sampling technique is routinely used to identify FEHB claims prior to or after processing that require(d) coordination of benefits (COB) with a third party payer. As an alternative, the Carrier may provide evidence that it pursues all claims for COB.

(2) Timeliness of Payments to Members or Providers

(i) Average Processing Time (All FEHB Claims) - the average number of working days from the date an FEHB claim is received to the date it is adjudicated (paid, denied or a request for further information is sent out), for the given time period, expressed as a cumulative percentage.

REQUIRED STANDARD:

(A) An average of 60 percent of FEHB claims received over the given time period are adjudicated within 20 working days (28 calendar days).

(B) An average of 80 percent of FEHB claims received over the given time period are adjudicated within 30 working days (42 calendar days).

(C) An average of 95 percent of FEHB claims received over the given time period are adjudicated within 60 working days (84 calendar days).

(3) Quality of Services and Responsiveness to Members

(i) Member Inquiries - the number of working days taken to respond to an FEHB member's written inquiry, expressed as a cumulative percentage for the given time period.

REQUIRED STANDARD:

(A) An average of 60 percent of FEHB member written inquiries are responded to within 10 working days (14 calendar days).

(B) An average of 90 percent of FEHB member written inquiries are responded to within 30 working days (42 calendar days).

(ii) Telephone Access - the Carrier shall report on the following statistics concerning telephone access to the member services department (or its equivalent) for the given time period. Except that, if the Carrier does not have a computerized phone system, report results of periodic surveys on telephone access.

(A) Telephone Waiting Time - the number of seconds elapsed before a member's telephone call is connected to a Carrier representative.

REQUIRED STANDARD: On average, no more than 1.5 minutes elapse before a member's telephone call is connected to a Carrier representative.

(CR-2000)

(B) Telephone Blockage Rate - the percentage of time that callers receive a busy signal when calling the Carrier.

REQUIRED STANDARD: On average, callers receive a busy signal no more than 10 percent of the time.

(C) Telephone Abandonment Rate - the number of calls attempted but not completed (presumably because callers tired of waiting to be connected to a Carrier representative) divided by the total number of calls attempted (both completed and not completed), expressed as a percentage.

REQUIRED STANDARD: On average, no more than 8 percent of calls are abandoned.

(4) Responsiveness to FEHB Member Requests for Reconsideration.

REQUIRED STANDARD: For 100 percent of written FEHB disputed claim requests received for the given time period, within 30 days after receipt by the Carrier, the Carrier must affirm the denial in writing to the FEHB member, pay the claim, provide the service, or request additional information reasonably necessary to make a determination.

(5) Quality Assurance Plan - the Carrier must demonstrate that a statistically valid sampling technique is routinely used prior to or after processing to randomly sample FEHB claims against Carrier quality assurance and abuse prevention standards.

(6) Physician Credentialing - the Carrier must demonstrate that it requires the following credential checks of all of its physicians, both during the initial hiring process and during periodic re-credentialing. As an alternative, the Carrier may demonstrate that the following credential checks are performed by a secondary source, such as a hospital.

(A) Verification of medical school graduation records.

(B) Routine check with local and/or state medical societies and/or boards.

(C) Routine check of the Department of Health and Human Services (DHHS) list of debarred providers.

(D) Routine check of the National Practitioner Data Bank.

(7) Appointments - All Health Maintenance Organization carriers must meet the following standards for the given time period. *Except that*, if this information is not routinely collected, report results from periodic surveys.

REQUIRED STANDARD:

(i) Urgent appointments are available, on average, within 24 hours of an authorized request for one.

(ii) Routine appointments are available, on average, within 1 month of an authorized request for one.

(iii) Average office waiting times - on average, members who arrive on time for a scheduled appointment wait no more than 30 minutes before they are seen by the provider of the medical service.

*(NOTE: For the purpose of this standard (7), a simplified classification system is used in which all appointments are classified as either emergency, urgent or routine. Emergency appointments must be seen immediately to prevent health deterioration. Urgent appointments are those for the sudden, acute onset of symptoms that must be seen within 1 (one) day to prevent health deterioration. All other appointments are considered routine.)*

(8) Assessing Quality of Health Care. The Carrier shall collect data on the measures endorsed by the Foundation for Accountability (FACCT), as requested by the OPM for services rendered through the Carrier's Preferred Provider Organization and/or Point of Service networks. Further, the Carrier shall provide statistical reports in accordance with FACCT guidelines when requested by OPM. The Carrier may be asked to collect data on one or more measures in a specified geographic locality. In addition, the Carrier shall report on measures developed by the National Committee for Quality Assurance as directed by OPM.

(b) The Carrier shall conduct a program to assess its vulnerability to fraud and abuse and shall operate a system designed to detect and eliminate fraud and abuse internally by Carrier employees and subcontractors, by providers providing goods or services to FEHB Members, and by individual FEHB Members.

(c) The Carrier shall keep complete records of its quality assurance procedures and fraud program and the results of their implementation and make them available to the Government as determined by OPM. If the Carrier cannot

separate FEHB claims from all other claims, the Carrier may report compliance based on all claims and indicate this on the report.

(d) The Contracting Officer may order the correction of a deficiency in the Carrier's quality assurance program or fraud program. The Carrier shall take the necessary action promptly to implement the Contracting Officer's order.

(e) Assessing Member Services. In addition to any other means of surveying Plan members that the Carrier may develop, the carrier shall participate in either a National Committee for Quality Assurance (NCQA) Health Plan Employer Data and Information Set (HEDIS) consumer survey or an FEHB-specific consumer survey, to provide feedback to enrollees on enrollee experience with the various FEHB plans. The Carrier shall take into account the published results of the survey, or other results as directed by OPM, in identifying areas for improvement as part of the Carrier's quality assurance program. Payment of survey charges will be in accordance with Section 3.7.

SECTION 1.10
NOTICE OF SIGNIFICANT EVENTS (JAN 1997) (FEHBAR 1652.222-70)

(a) The Carrier agrees to notify the Contracting Officer of any Significant Event within ten (10) working days after the Carrier becomes aware of it. As used in this section, a Significant Event is any occurrence or anticipated occurrence that might reasonably be expected to have a material effect upon the Carrier's ability to meet its obligations under this contract, including, but not limited to, any of the following:

(1) Disposal of major assets;

(2) Loss of 15% or more of the Carrier's overall membership;

(3) Termination or modification of any contract or subcontract if such termination or modification might have a material effect on the Carrier's obligations under this contract;

(4) Addition or termination of provider agreements;

(5) Any changes in underwriters, reinsurers or participating plans;

(6) The imposition of, or notice of the intent to impose, a receivership, conservatorship, or special regulatory monitoring;

(7) The withdrawal of, or notice of intent to withdraw State licensing, HHS qualification, or any other status under Federal or State law;

(8) Default on a loan or other financial obligation;

(9) Any actual or potential labor dispute that delays or threatens to delay timely performance or substantially impairs the functioning of the Carrier's facilities or facilities used by the Carrier in the performance of the contract;

(10) Any change in its charter, constitution, or by-laws which affects any provision of this contract or the Carrier's participation in the Federal Employees Health Benefits Program;

(11) Any significant changes in policies and procedures or interpretations of the contract or brochure which would affect the benefits available under the contract or the costs charged to the contract;

(12) Any fraud, embezzlement or misappropriation of FEHB funds; or

(13) Any written exceptions, reservations or qualifications expressed by the independent accounting firm (which ascribes to the standards of the American Institute of Certified Public Accountants) contracted with by the Carrier to provide an opinion on its annual financial statements.

(b) Upon learning of a Significant Event OPM may institute action, in proportion to the seriousness of the event, to protect the interest of Members, including, but not limited to--

(1) Directing the Carrier to take corrective action;

(2) Suspending new enrollments under this contract;

(3) Advising Enrollees of the Significant Event and providing them an opportunity to transfer to another plan;

(4) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account;

(5) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by he Significant Event; or

(6) Terminating this contract pursuant to Section 1.15, *Renewal and Withdrawal of Approval.*

(CR-2000)

(c) Prior to taking action as described in paragraph (b) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(d) The Carrier shall insert this clause in any subcontract or subcontract modification if both the amount of the subcontract or modification charged to the FEHBP (or, in the case of a community-rated carrier, applicable to the FEHBP) exceeds $100,000 and the amount of the subcontract or modification to be charged to the FEHBP (or, in the case of a community-rated carrier, applicable to the FEHBP) exceeds 25 percent of the total cost of the subcontract or modification. If the Carrier is an HMO, it shall also insert this clause in all provider agreements over $25,000. If the Carrier is not an HMO, it shall also insert this clause in the contract with its underwriter, if any. The Carrier shall substitute "Contractor" or other appropriate reference for the term "Carrier."

SECTION 1.11
FEHB INSPECTION (JAN 1991) (FEHBAR 1652.246-70)

(a) The Government or its agent has the right to inspect and evaluate the work performed or being performed under the contract, and the premises where the work is being performed, at all reasonable times and in a manner that will not unduly delay the work. If the Government or its agent performs inspection or evaluation on the premises of the Carrier or a subcontractor, the Carrier shall furnish and require the subcontractor to furnish all reasonable facilities and assistance for the safe and convenient performance of these duties.

(b) The Carrier shall insert this clause in all subcontracts for underwriting and administrative services and shall substitute "Contractor" or other appropriate reference for the term "Carrier."

SECTION 1.12
CORRECTION OF DEFICIENCIES (JAN 1997)

(a) The Carrier shall maintain sufficient financial resources, facilities, providers, staff and other necessary resources to meet its obligations under this contract. If the OPM determines that the Carrier does not demonstrate the ability to meet its obligations under this contract, the OPM shall notify the Carrier of the asserted deficiencies. The Carrier agrees that, within ten (10) working days following notification, it shall present detailed plans for correcting the deficiencies. These plans shall be presented in a form prescribed by the OPM. Pending submission or implementation of plans required under this Section, the OPM may institute action as it deems necessary to protect the interests of Members, including, but not limited to:

(1) Suspending new enrollments under this contract;

(2) Advising Enrollees of the asserted deficiencies and providing them an opportunity to transfer to another plan;

(3) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account; or

(4) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by the deficiency.

(b) The Carrier agrees that failure to submit or to diligently implement plans which are required under this Section shall constitute sufficient grounds for termination of this contract pursuant to Section 1.15, *Renewal and Withdrawal of Approval.*

(c) Prior to taking action as described in paragraph (a) the OPM shall notify the Carrier and offer an opportunity to respond.

(d) The Carrier shall include the substance of this clause in the contract with its underwriter and substitute an appropriate term for "Carrier."

SECTION 1.13
INFORMATION AND MARKETING MATERIALS (JAN 1999)

(a) OPM and the Carrier shall agree upon language setting forth the benefits, exclusions and other language of the Plan. OPM in its sole discretion, may order the Carrier to print and distribute the agreed upon brochure text in a format and quantity approved by OPM, including an electronic brochure version for OPM's World

Wide Web Site. This formatted document is referred to as the FEHB brochure. The Carrier shall distribute the FEHB brochure to all Federal employees, annuitants, former spouses and former employees and dependents enrolled in the Plan. The Carrier shall also distribute the document(s) to Federal agencies to be made available to such individuals who are eligible to enroll under this contract. At the direction of OPM, the Carrier shall produce and distribute an audio cassette version of the approved language. The Carrier may print additional FEHB brochures for distribution or its own use, but only in the approved format and at its own expense.

(b) Supplemental material. Only marketing materials or other supplemental literature prepared in accordance with FEHBAR 1625.203-70 (Section 1.14 of this contract) may be distributed or displayed at or through Federal facilities.

(c) The Carrier shall reflect the statement of benefits in the agreed upon brochure text included at Appendix A of this contract, verbatim, in the FEHB brochure.

(d) OPM may order the Carrier to prepare an addendum or reissue the FEHB brochure or any piece(s) of supplemental marketing material at no expense to the Government if it is found to not conform to the agreed upon brochure text and/or supplemental marketing materials preparations described in paragraphs (a), (b) and (c) of this section.

SECTION 1.14
MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (JAN 1991)(FEHBAR 1652.203-70)

(a) The Carrier agrees that any advertising material, including that labeled promotional material, marketing material, or supplemental literature, shall be truthful and not misleading.

(b) Criteria to assess compliance with paragraph (a) of this clause are available in the FEHB Supplemental Literature Guidelines which are developed by OPM and should be used, along with the additional guidelines set forth in FEHBAR 1603.702, as the primary guide in preparing material; further guidance is provided in the NAIC *Advertisements of Accident and Sickness Insurance Model Regulation*. The guidelines contained in this document are periodically updated and provided to the Carrier by OPM.

(c) Failure to conform to paragraph (a) of this clause may result in a reduction in the service charge, if appropriate, and corrective action to protect the interest of Federal Members. Corrective action will be appropriate to the circumstances and may include, but is not limited to the following actions by OPM:

(1) Directing the Carrier to cease and desist distribution, publication, or broadcast of the material;

(2) Directing the Carrier to issue corrections at the Carrier's expense and in the same manner and media as the original material was made; and

(3) Directing the Carrier to provide, at the Carrier's expense, the correction in writing by certified mail to all enrollees of the Plan(s) that had been the subject of the original material.

(d) Egregious or repeated offenses may result in the following action by OPM:

(1) Suspending new enrollments in the Carrier's Plan(s);

(2) Providing Enrollees an opportunity to transfer to another plan; and

(3) Terminating the contract in accordance with Section 1.15, *Renewal and Withdrawal of Approval*.

(e) Prior to taking action as described in paragraphs (c) and (d) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(f) The Carrier shall incorporate this clause in subcontracts with its underwriter, if any, and other subcontractors directly involved in the preparation or distribution of such advertising material and shall substitute "Contractor" or other appropriate reference for the term "Carrier."

SECTION 1.15
RENEWAL AND WITHDRAWAL OF APPROVAL (JAN 1991) (FEHBAR 1652.249-70)

(a) The contract renews automatically for a term of one (1) year each January first, unless written notice of non-renewal is given either by

OPM or the Carrier not less than 60 calendar days before the renewal date, or unless modified by mutual agreement.

(b) This contract also may be terminated at other times by order of OPM pursuant to 5 U.S.C. 8902(e). After OPM notifies the Carrier of its intent to terminate the contract, OPM may take action as it deems necessary to protect the interests of Members, including but not limited to--

(1) Suspending new enrollments under the contract;

(2) Advising Enrollees of the asserted deficiencies; and

(3) Providing Enrollees an opportunity to transfer to another plan.

(c) OPM may, after proper notice, terminate the contract at the end of the contract term if it finds that the Carrier did not have at least 300 Enrollees enrolled in its Plan at any time during the two preceding contract terms.

SECTION 1.16
[RESERVED]

SECTION 1.17
NOVATION AGREEMENT (JAN 1996)

The agreement at FEHBAR 1642.1204 shall be submitted for approval to OPM when the Carrier's assets or the entire portion of the assets pertinent to the performance of this contract, as determined by the Government, are transferred.

SECTION 1.18
AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (JAN 1996)

The agreement at FEHBAR 1642.1205 shall be submitted for approval to OPM when the Carrier changes its name and the Government's and Contractor's rights and obligations remain unaffected.

SECTION 1.19
CERTIFICATION UNDER P. L. 104-191 (HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996) (JAN 1998)

The Carrier shall issue a certification of coverage for enrollees in accordance with the regulations issued by the Health Care Financing Administration.

SECTION 1.20
PATIENTS' BILL OF RIGHTS (JAN 1999)

(a) The Carrier shall implement the recommendations in the Health Care Consumer Bill of Rights and Responsibilities ("Patient Bill of Rights") in accordance with OPM guidance.

(b) During the Carrier's provider contract renewal process, the Carrier shall make any necessary modifications to such provider contracts to comply with the recommendations of the Patient Bill of Rights in accordance with OPM guidance. All new provider contracts with the Carrier shall comply with the recommendations of the Patient Bill of Rights in accordance with OPM guidance.

SECTION 1.21
[RESERVED]

SECTION 1.22
HIPAA COMPLIANCE (JAN 1998)

(a) The Carrier shall comply with and shall take all steps reasonably necessary to ensure that its affiliates, subcontractors, and agents comply with the guaranteed availability provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and implementing regulations. "Guaranteed availability" means the Carrier, affiliates, subcontractors, and agents do not engage in practices that: 1) decline to offer health insurance coverage (as defined in section 2791(b)(1) of the Public Health Service Act "the Act" ) to, or deny enrollment of an eligible individual (as defined in section 2741(b) of the Act); or, 2) impose any preexisting condition exclusion (as defined in section 2701(b)(1)(A) of the Act), with respect to such coverage.

(b) A State or Federal enforcement action as the result of noncompliance with the requirements of HIPAA is a significant event under Section 1.10 of this contract, Notice of Significant Events. If the Carrier, or any affiliate, subcontractor, or agent, is notified of any

(CR-2000)

enforcement action by any Federal or State authority with regard to HIPAA compliance, the Carrier must notify OPM within ten working days of learning of the action.

SECTION 1.23
NOTICE TO ENROLLEES ON TERMINATION OF FEHBP OR PROVIDER CONTRACT (JAN 2000)

(a) Enrollees who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy at the time a carrier terminates (1) all or part of its FEHBP contract, or (2) the enrollee's specialty provider contract for reasons other than cause, may be able to continue to see their specialty provider for up to 90 days or through their postpartum care.

(b) The Carrier shall notify its enrollees in writing of its intent to terminate all or part of its FEHBP contract, including service area reductions, or the enrollees' specialty provider contract, for reasons other than cause in order to allow sufficient time for the enrollees to arrange for continued care after the 90-day period. The Carrier shall send the notice in time to ensure it is received by the enrollees no less than 90 days prior to the date it terminates the contract, unless the Carrier demonstrates it was prevented from doing so for reasons beyond its control. The Carrier's prompt notice will ensure that the notification period and transitional care period run concurrently.

SECTION 1.24
TRANSITIONAL CARE (JAN 2000)

(a) Transitional care is specialized care provided for up to 90 days or through the postpartum period to an enrollee undergoing treatment for a chronic or disabling condition or who is in the second or third trimester of pregnancy when his or her carrier terminates (1) all or part of its FEHBP contract, or (2) the enrollee's specialty provider contract for reasons other than cause. The 90-day period begins the earlier of the date the enrollee receives the notice required under Section 1.23, Notice to Enrollees on Termination of FEHBP or Provider Contract, or the date the Carrier's or the provider's contract ends.

(b) Beginning January 1, 2000, the Carrier shall ensure the following:

(1) *If it terminates a part of its FEHB contract or a specialty provider contract* other than for cause, it allows enrollees who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy to continue treatment under the specialty provider for up to 90 days, or through their postpartum period, under the same terms and conditions that existed at the beginning of the transitional care period; and

(2) *If it enrolls a new member who involuntarily changed carriers because the enrollee's former carrier was no longer available in the FEHB Program*, it provides transitional care for the enrollee if he or she is undergoing treatment for a chronic or disabling condition or is in the second or third trimester of pregnancy for up to 90 days, or through the postpartum period, under the same terms and conditions the enrollee had under the prior carrier.

(c) In addition, the Carrier shall (1) pay for or provide the transitional care required under this clause at no additional cost to enrollees;

(2) require the specialty provider to promptly transfer all medical records to the designated new provider during or upon completion of the transition period, as authorized by the patient; and,

(3) require the specialty provider to give all necessary information to the Carrier for quality assurance purposes.