# PART II – BENEFITS

## SECTION 2.1
## ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT (JAN 1999)

(a) Enrollment.

(1) Each eligible individual who wishes to be enrolled in the plan offered by this Carrier shall, as a prerequisite to such enrollment, complete a Health Benefits Election Form or use an electronic or telephonic method approved by OPM, within the time and under the conditions specified in 5 CFR Part 890. The Government personnel office having cognizance over the Enrollee shall promptly furnish notification of such election to the Carrier.

(2) A person's eligibility for coverage, effective date of enrollment, the level of benefits (option), the effective date of termination or cancellation of a person's coverage, the date any extension of a person's coverage ceases, and any continuance of benefits beyond a period of enrollment and the date any such continuance ceases, shall all be determined in accordance with regulations or directions of OPM given pursuant to chapter 89, title 5, United States Code.

(b) The Carrier shall, subject to the approval of the Contracting Officer, define an area from which it will accept enrollments. The Carrier may limit enrollment to individuals residing or employed inside the approved area.

(c) The Carrier shall issue evidence of the Enrollee's coverage and furnish to the Enrollee copies of any claim forms as necessary.

## SECTION 2.2
## BENEFITS PROVIDED (JAN 1999)

(a) The Carrier shall provide the benefits as described in the agreed upon brochure text found in Appendix A.

(1) Benefits offered under this contract may be modified by the Carrier to permit methods of treatment not expressly provided for, but not prohibited by law, rule or Federal policy, if otherwise contractually appropriate, and if such treatment is medically necessary and is as cost effective as providing benefits to which the Member may otherwise be entitled.

(2) The Carrier may pay for or provide a health service or supply in an individual case which does not come within the specific benefit provisions of the contract, if the Carrier determines the benefit is within the intent of the contract, and the Carrier determines that the provision of such benefit is in the best interests of the Federal Employees Health Benefits Program.

(3) In individual cases, the Carrier, after consultation with and concurrence by the Member and provider(s), may offer a benefit alternative not ordinarily covered under this contract which will result in equally effective medical treatment at no greater cost. The decision to offer an alternative benefit is solely the Carrier's and is not subject to OPM review under the disputed claims process.

(b) In each case when the Carrier provides a benefit in accordance with the authority of (a)(1), (2) or (3) the Carrier shall document in writing prior to the provision of such benefit the reasons and justification for its determination. Such payment or provision of services or supplies shall not be considered to be a precedent in the disposition of similar cases.

(c) Except as provided for in (a) above, the Carrier shall provide benefits for services or supplies in accordance with Appendix A.

(d) The Carrier, subject to (e) below, shall determine whether in its judgment a service or supply is medically necessary or payable under this contract.

(e) The Carrier agrees to pay for or provide a health service or supply in an individual case if OPM finds that the Member is entitled thereto under the terms of the contract.

## SECTION 2.3
## PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES (JAN 1996)

(a) By enrolling or accepting services under this contract, Members are obligated to all terms, conditions, and provisions of this contract. The Carrier may request Members to

complete reasonable forms or provide information which the Carrier may reasonably request; *provided*, however, that the Carrier shall not require Members to complete any form as a precondition of receiving benefits unless the form has first been approved for use by OPM. Notwithstanding Section 2.11 *Claims Processing,* forms requiring specific approval do not include claim forms and other forms necessary to receive payment of individual claims.

(b) When members are required to file claims for covered benefits, benefits shall be paid (with appropriate documentation of payment) within a reasonable time after receipt of reasonable proof covering the occurrence, character, and extent of the event for which the claim is made. The claimant shall furnish satisfactory evidence that all services or supplies for which expenses are claimed are covered services or supplies within the meaning of the contract.

(c) The procedures and time period for receiving benefits and filing claims shall be as specified in the agreed upon brochure text *(Appendix A).* However, failure to file a claim within the time required shall not in itself invalidate or reduce any claim where timely filing was prevented by administrative operations of Government or legal incapacitation, provided the claim was submitted as soon as reasonably possible.

(d) The Carrier may request a Member to submit to one or more medical examinations to determine whether benefits applied for are for services and supplies necessary for the diagnosis or treatment of an illness or injury or covered condition. The examinations shall be made at the expense of the Carrier.

(e) As a condition precedent to the provision of benefits hereunder, the Carrier, to the extent reasonable and necessary and consistent with Federal law, shall be entitled to obtain from any person, organization or Government agency, including the Office of Personnel Management, all information and records relating to visits or examination of, or treatment rendered or supplies furnished to, a Member as the Carrier requires in the administration of such benefits. The Carrier may obtain from any insurance company or other organization or person any information, with respect to any Member, which it has determined is reasonably necessary to:

(1) identify enrollment in a plan,

(2) verify eligibility for payment of a claim for health benefits, and

(3) carry out the provisions of the contract, such as subrogation, recovery of payments made in error, workers compensation, and coordination of benefits.

(f) When claim filing is required, benefits are payable to the Enrollee in the Plan or his or her assignees. However, under the following circumstances different payment arrangements are allowed:

(1) Reimbursement Payments for the Enrollee. If benefits become payable to the estate of an Enrollee or an Enrollee is a minor, or an Enrollee is physically or mentally not competent to give a valid release, the Carrier may either pay such benefits directly to a hospital or other provider of services or pay such benefits to any relative by blood or connection by marriage of the Enrollee determined by the Carrier to be equitably entitled thereto.

(2) Reimbursement Payments for a minor child. If a child is covered as a family member under the Enrollee's self and family enrollment and is in the custody of a person other than the Enrollee, and if that other person certifies to the Carrier that he or she has custody of and financial responsibility for the dependent child, then the Carrier may issue an identification card for the dependent child(ren) to that person and, when claim filing is required, may reimburse that person for any covered medical service or supply.

(3) Reimbursement Payments to family members covered under the Enrollee's self and family enrollment. If a covered child is legally responsible, or if a covered spouse is legally separated, and if the covered person does not reside with the Enrollee and certifies such conditions to the Carrier, then the Carrier may issue an identification card to the person and when claim filing is required, the Carrier may reimburse that person for any covered medical service or supply.

(4) Any payments made in good faith in accordance with paragraphs (f)(1) through

(f)(3) shall fully discharge the Carrier to the extent of such payment.

(g) Overpayments. If the Carrier or OPM determines that a Member's claim has been paid in error for any reason, the Carrier shall make a diligent effort to recover an overpayment to the member from the member or, if to the provider, from the provider. Diligent effort to recover overpayments means that upon discovering that an overpayment exists, the Carrier shall--

(1) Send a written notice of overpayment to the member or provider that provides: (A) an explanation of when and how the overpayment occurred, (B) when applicable, cite the appropriate contractual benefit provision, (C) the exact identifying information (i.e., dollar amount overpaid, date paid, check number, date of service and provider name), (D) a request for payment of the debt in full, and (E) an explanation of what may occur should the debt not be paid, including possible offset to future benefits. The notice may also offer an installment option. In addition, the Carrier shall provide the debtor with an opportunity to dispute the existence and amount of the debt before proceeding with collection activities;

(2) After confirming that the debt does exist and in the appropriate amount, send follow-up notices to the member or the provider at 30, 60 and 90 day intervals, if the debt remains unpaid and undisputed;

(3) The Carrier may off-set future benefits payable to the member or to a provider on behalf of the member to satisfy a debt due under the FEHBP if the debt remains unpaid and undisputed for 120 days after the first notice.

(4) After applying the first three steps, refer cases to a collection attorney or a collection agency if the debt is not recovered;

(5) Make diligent effort to recover overpayments until the debt is paid in full or determined to be uncollectible by the Carrier because it is no longer cost effective to pursue further collection efforts or it would be against equity and good conscience to continue collection efforts.

(6) Suspend recovery efforts for a debt which is based upon a claim that has been appealed as a disputed claim under Section 2.8, until the appeal has been resolved;

(7) Maintain records that document individual unrecovered overpayment collection activities for audit or future reference.

SECTION 2.4
TERMINATION OF COVERAGE AND CONVERSION PRIVILEGES (JAN 1996)

(a) A Member's coverage is terminated as specified in regulations issued by the OPM. Benefits after termination of coverage are as specified in the regulations.

(b) A Member is entitled to a temporary continuation of coverage or an extension of coverage under the conditions and to the extent specified in the regulations.

(c) A Member whose coverage hereunder has terminated is entitled, upon application within the times and under the conditions specified in regulations, to a non-group contract regularly offered for the purpose of conversion from the contract or similar contracts. The conversion contract shall be in compliance with 5 U.S.C., chapter 89, and regulations issued thereunder.

(d) Costs associated with writing or providing benefits under conversion contracts shall not be an allowable cost of this contract.

(e) The Carrier shall maintain on file with OPM copies of the conversion policies offered to persons whose coverage under this contract terminates and advise OPM promptly of any changes in the policies. The Contracting Officer may waive this requirement where because of the large number of different conversion policies offered by the Carrier it would be impractical to maintain a complete up-to-date file of all policies. In this case the Carrier shall submit a representative sample of the general types of policies offered and provide copies of specific policies on demand.

SECTION 2.5
SUBROGATION (JAN 1998)

a) The Carrier shall subrogate FEHB claims in the same manner in which it subrogates claims for non-FEHB members, according to the following rules:

(1) The Carrier shall subrogate FEHB claims if it is doing business in a State in which subrogation is permitted, and in which the Carrier subrogates for non-FEHB members;

(2) The Carrier shall subrogate FEHB claims if it is doing business in a State in which subrogation is prohibited, but in which the Carrier subrogates for at least one plan covered under the Employee Retirement Income Security Act of 1974 (ERISA);

(3) The Carrier shall not subrogate if it is doing business in a State that prohibits subrogation, and in which the Carrier does not subrogate for any plan covered under ERISA;

(4) For Carriers doing business in more than one State, the Carrier shall apply the rules in (1) through (3) of this subsection according to the rule applicable to the State in which the subrogation would take place.

(b) The Carrier's subrogation procedures and policies shall be shown in the agreed upon brochure text or made available to the enrollees upon request.

SECTION 2.6
COORDINATION OF BENEFITS (JAN 1991) (FEHBAR 1652.204-71)

(a) The Carrier shall coordinate the payment of benefits under this contract with the payment of benefits under Medicare, other group health benefits coverages, and the payment of medical and hospital costs under no-fault or other automobile insurance that pays benefits without regard to fault.

(b) The Carrier shall not pay benefits under this contract until it has determined whether it is the primary carrier or unless permitted to do so by the Contracting Officer.

(c) In coordinating benefits between plans, the Carrier shall follow the order of precedence established by the NAIC Model Guidelines for Coordination of Benefits (COB) as specified by OPM.

(d) Where (1) the Carrier makes payments under this contract which are subject to COB provisions; (2) the payments are erroneous, not in accordance with the terms of the contract, or in excess of the limitations applicable under this contract; and (3) the Carrier is unable to recover such COB overpayments from the Member or the providers of services or supplies, the Contracting Officer may allow such amounts to be charged to the contract; the Carrier must be prepared to demonstrate that it has made a diligent effort to recover such COB overpayments.

(e) COB savings shall be reported by experience-rated carriers each year along with the Carrier's annual accounting statement in a form specified by OPM.

(f) Changes in the order of precedence established by the NAIC Model Guidelines implemented after January 1 of any given year shall be required no earlier than the beginning of the following contract term.

*[NOTE: Subsection 2.6(b) will not be applied to this community-rated carrier. When there is double coverage for covered benefits, other than emergency services from non-Plan providers, the Health Maintenance Organization Carrier will continue to provide benefits in full, but will seek payment for the services and supplies provided, to the extent that the services and supplies are covered by the other coverage, no-fault automobile insurance or other primary plan. Likewise, Subsection 2.6(d) is not applicable to community-rated carriers.]*

SECTION 2.7
DEBARMENT AND OTHER SANCTIONS (JAN 1999)

(a) Notwithstanding 5 U.S.C. 8902(j) or any other provision of the law and regulations, if, under 5 U.S.C. 8902a, 5 CFR 970, or Public Law 103-123 (or other applicable appropriations law), a provider is barred from participating in the Program under 5 U.S.C. or the provider's services under 5 U.S.C. are excluded, the Carrier agrees that no payment shall be made by the Carrier pursuant to any contract under 5 U.S.C. (either to such provider or by reimbursement) for any service or supply furnished by such provider during the period of the debarment, except as provided in 5 CFR 970.200(b).

(b) The OPM shall notify the Carrier when a provider is barred from the FEHBP.

SECTION 2.8
FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS (MAR 1995) (FEHBAR 1652.204-72)

(a) General. (1) The Carrier resolves claims filed under the Plan. All health benefit claims must be submitted initially to the Carrier. If the Carrier denies a claim, (or a portion of a claim), the covered individual may ask the Carrier to reconsider its denial. If the Carrier affirms its denial or fails to respond as required by paragraph (b) of this clause, the covered individual may ask OPM to review the claim. A covered individual must exhaust both the Carrier and OPM review processes specified in this clause before seeking judicial review of the denied claim.

(2) This clause applies to covered individuals and to other individuals or entities who are acting on the behalf of a covered individual and who have the covered individual's specific written consent to pursue payment of the disputed claim.

(b) Time limits for reconsidering a claim. (1) The covered individual has 6 months from the date of the notice to the covered individual that a claim (or a portion of a claim) was denied by the Carrier in which to submit a written request for reconsideration to the Carrier. The time limit for requesting reconsideration may be extended when the covered individual shows that he or she was prevented by circumstances beyond his or her control from making the request within the time limit.

(2) The Carrier has 30 days after the date of receipt of a timely-filed request for reconsideration to:

(i) Affirm the denial in writing to the covered individual;

(ii) Pay the bill or provide the service; or

(iii) Request from the covered individual or provider additional information needed to make a decision on the claim. The Carrier must simultaneously notify the covered individual of the information requested if it requests additional information from a provider. The Carrier has 30 days after the date the information is received to affirm the denial in writing to the covered individual or pay the bill or provide the service. The Carrier must make its decision based on the evidence it has if the covered individual or provider does not respond within 60 days after the date of the Carrier's notice requesting additional information. The Carrier must then send written notice to the covered individual of its decision on the claim. The covered individual may request OPM review as provided in paragraph (b)(3) of this clause if the Carrier fails to act within the time limit set forth in this paragraph.

(3) The covered individual may write to OPM and request that OPM review the Carrier's decision if the Carrier either affirms its denial of a claim or fails to respond to a covered individual's written request for reconsideration within the time limit set forth in paragraph (b)(2) of this clause. The covered individual must submit the request for OPM review within the time limit specified in paragraph (e)(1) of this clause.

(4) The Carrier may extend the time limit for a covered individual's submission of additional information to the Carrier when the covered individual shows he or she was not notified of the time limit or was prevented by circumstances beyond his or her control from submitting the additional information.

(c) Information required to process requests for reconsideration. (1) The covered individual must put the request to the Carrier to reconsider a claim in writing and give the reasons, in terms of applicable brochure provisions, that the denied claim should have been approved.

(2) If the Carrier needs additional information from the covered individual to make a decision, it must:

(i) Specifically identify the information needed;

(ii) State the reason the information is required to make a decision on the claim;

(iii) Specify the time limit (60 days after the date of the Carrier's request) for submitting the information; and

(iv) State the consequences of failure to respond within the time limit specified, as set out in paragraph (b)(2) of this section.

(d) Carrier determinations. The Carrier must provide written notice to the covered individual of its determination. If the Carrier

affirms the initial denial, the notice must inform the covered individual of:

(1) The specific and detailed reasons for the denial;

(2) The covered individual's right to request a review by OPM; and

(3) The requirement that requests for OPM review must be received within 90 days after the date of the Carrier's denial notice and include a copy of the denial notice as well as documents to support the covered individual's position.

(e) OPM review. (1) If the covered individual seeks further review of the denied claim, the covered individual must make a request to OPM to review the Carrier's decision. Such a request to OPM must be made:

(i) Within 90 days after the date of the Carrier's notice to the covered individual that the denial was affirmed; or

(ii) If the Carrier fails to respond to the covered individual as provided in paragraph (b)(2) of this clause, within 120 days after the date of the covered individual's timely request for reconsideration by the Carrier; or

(iii) Within 120 days after the date the Carrier requests additional information from the covered individual, or the date the covered individual is notified that the Carrier is requesting additional information from a provider. OPM may extend the time limit for a covered individual's request for OPM review when the covered individual shows he or she was not notified of the time limit or was prevented by circumstances beyond his or her control from submitting the request for OPM review within the time limit.

(2) In reviewing a claim denied by the Carrier, OPM may

(i) Request that the covered individual submit additional information;

(ii) Obtain an advisory opinion from an independent physician;

(iii) Obtain any other information as may in its judgment be required to make a determination; or

(iv) Make its decision based solely on the information the covered individual provided with his or her request for review.

(3) When OPM requests information from the Carrier, the Carrier must release the information within 30 days after the date of OPM's written request unless a different time limit is specified by OPM in its request.

(4) Within 90 days after receipt of the request for review, OPM will either:

(i) Give a written notice of its decision to the covered individual and the Carrier; or

(ii) Notify the individual of the status of the review. If OPM does not receive requested evidence within 15 days after expiration of the applicable time limit in paragraph (e)(3) of this clause, OPM may make its decision based solely on information available to it at that time and give a written notice of its decision to the covered individual and to the Carrier.

(f) OPM, upon its own motion, may reopen its review if it receives evidence that was unavailable at the time of its original decision.

(g) Court review. (1) A suit to compel enrollment under § 890.102 of Title 5, Code of Federal Regulations, must be brought against the employing office that made the enrollment decision.

(2) A suit to review the legality of OPM's regulations under this part must be brought against the Office of Personnel Management.

(3) Federal Employees Health Benefits (FEHB) carriers resolve FEHB claims under authority of Federal statute (chapter 89, title 5, United States Code). A covered individual may seek judicial review of OPM's final action on the denial of a health benefits claim. A legal action to review final action by OPM involving such denial of health benefits must be brought against OPM and not against the Carrier or the Carrier's subcontractors. The recovery in such a suit shall be limited to a court order directing OPM to require the Carrier to pay the amount of benefits in dispute.

(4) An action under paragraph (3) of this clause to recover on a claim for health benefits:

(i) May not be brought prior to exhaustion of the administrative remedies provided in paragraphs (a) through (f) of this clause;

(ii) May not be brought later than December 31 of the 3rd year after the year in which the care or service was provided; and

(CR-2000)

(iii) Will be limited to the record that was before OPM when it rendered its decision affirming the Carrier's denial of benefits.

SECTION 2.9
PROTECTION OF MEMBERS AGAINST PROVIDER CLAIMS (JAN 1996)

(a) The Carrier shall provide the Contracting Officer with evidence that its contracts with providers (hospitals and physicians) contain a provision that, in the event of Carrier insolvency, or inability to pay expenses for any reason, the providers shall not look to Members for payment. The Carrier agrees that over 90 percent of the total benefit cost under this contract will be provided under such contracts with providers; or

(b) In lieu of subsection (a) above, the Contracting Officer may accept such other combinations of coverage which provide protection of Members against provider claims as defined in the NAIC (National Association of Insurance Commissioners) Model HMO Act, as amended; or

(c) The Carrier shall provide the Contracting Officer with documentation that it has such other appropriate combinations of coverage which would provide protection of Members against provider claims in the event of Carrier insolvency, or inability to pay expenses for any reason.

(d) The Carrier shall notify the Contracting Officer as soon as it is aware that it will not be able to satisfy the requirements stated in subsections (a), (b), or (c) above.

SECTION 2.10
INDEPENDENT LABORATORIES (JAN 1991)

In order to assure a minimum standard of quality for laboratory services, the Carrier agrees that it will not use independent laboratories which do not comply with Medicare or similar standards.

SECTION 2.11
CLAIMS PROCESSING (JAN 1998)

A standardized claims filing process shall be used by all FEHB carriers. The Carrier shall apply procedures for using the standard claims process. At a minimum the Carrier's program must achieve the following objectives:

(1) By the year 2000, the majority of provider claims should be submitted electronically;

(2) All physicians shall be notified that future claims must be submitted electronically or on the Health Care Financing Administration 1500 form;

(3) The Carrier shall not use any unique physician claim form(s) for such FEHB member claims;

(4) The Carrier should reject all such claims submitted on forms other than the HCFA 1500 form and shall explain the reason on the Explanation of Benefits form; and

(5) The Carrier shall advise OPM of its progress in implementing this policy as directed by the Contracting Officer.

SECTION 2.12 CALCULATION OF COST SHARING PROVISIONS (JAN 1996)

When the Member is required to pay a specified percentage of the cost of covered services, the Member's obligation for covered services shall be based on the amount the provider has agreed to accept as full payment, including future discounts that are known and that can be accurately calculated at the time the claim is processed. This includes for example, prompt pay discounts as well as other discounts granted for various business reasons.

SECTION 2.13
BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY (JAN 1998)

When a Member who is covered by Medicare Part A, Part B, or Parts A and B on a fee-for-service basis (a) receives services that generally are eligible for coverage by Medicare (regardless of whether or not benefits are paid by Medicare) and are covered by the Carrier, and (b) Medicare is the primary payer and the Carrier is the secondary payer for the Member under the order of benefit determination rules

stated in Appendix A of this contract, then the Carrier shall limit its payment to an amount that supplements the benefits payable by Medicare (regardless of whether or not Medicare benefits are paid). When emergency services have been provided by a Medicare nonparticipating institutional provider and the provider is not reimbursed by Medicare, the Carrier shall pay its primary benefits. Payments that supplement Medicare include amounts necessary to reimburse the Member for Medicare deductibles, coinsurance, and the balance between the Medicare approved amount and the Medicare limiting charge made by non-participating providers. This provision does not apply to debarred providers (see Section 2.7).

SECTION 2.14
CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER (JAN 2000)

(a) The Carrier shall fulfill all of the requirements agreed to under the contract that continue after termination. The order of precedence for the applicable laws, regulations, and the contract are listed in Section 1.3.

(b) Contract requirements that extend beyond the date of the Carrier's termination include, but are not limited to, offering conversion contracts to enrollees during the 31-day extension of coverage for conversion, providing benefits to the enrollee until the effective date of the new enrollment, and processing and paying claims incurred prior to the termination date.

# PART III - PAYMENTS, CHARGES AND ACCOUNTING

## SECTION 3.1
## PAYMENTS (JAN 1999) (FEHBAR 1652.232-70)

(a) OPM will pay to the Carrier, in full settlement of its obligations under this contract, subject to adjustment for error or fraud, the subscription charges received for the Plan by the Employees Health Benefits Fund (hereinafter called the Fund) less the amounts set aside by OPM for the Contingency Reserve and for the administrative expenses of OPM, amounts assessed under FEHBAR 1609.7101-2, and amounts for obligations due pursuant to paragraph (b) of this clause, plus any payments made by OPM from the Contingency Reserve.

(b) OPM will notify the Carrier of amounts due for outstanding obligations under the contract. Not later than 60 days after the date of written notice from OPM, the Carrier shall reimburse OPM. If payment is not received within the prescribed time frame, OPM shall withhold the amount due from the subscription charges owed the Carrier under paragraph (a) of this clause

(c) The specific subscription rates, charges, allowances and limitations applicable to the contract are set forth in Appendix B.

(d) Recurring payments from premiums shall be due and payable not later than thirty days after receipt by the Fund. The Contracting Officer may authorize special nonrecurring payments from the Contingency Reserve in accordance with OPM's regulations.

(e) In the event this contract between the Carrier and OPM is terminated or not renewed in accordance with General Provision 1.15, *Renewal and Withdrawal of Approval*, the Contingency Reserve of the Carrier held by OPM shall be available to the Carrier to pay the necessary and proper charges against this contract to the extent that the reserves held by the Carrier are insufficient for that purpose.

*[NOTE: The adjustment for error or fraud referenced in paragraph (a) and the necessary and proper charges against this contract if the contract is terminated or not renewed, referenced in subsection (d), shall be limited to the subscription rate and any contingency reserve payment otherwise provided for in this contract and shall not include claim charges or other expenses attributable to individual Members. Further, FEHBAR 1652.216-70, Accounting and Price Adjustment, applies if any adjustment to the contract price is determined.]*

## SECTION 3.2
## ACCOUNTING AND PRICE ADJUSTMENT (JAN 2000) (FEHBAR 1652.216-70)

(a) *Annual Accounting Statement.* The Carrier, not later than 90 days after the end of each contract period, shall furnish to OPM for that contract period an accounting of its operations under the contract. The accounting shall be in the form prescribed by OPM.

(b) *Adjustment.* (1) This contract is community rated as defined in FEHBAR 1602.170-2.

(2) The subscription rates agreed to in this contract shall be equivalent to the subscription rates given to the Carrier's similarly sized subscriber groups (SSSGs) as defined in FEHBAR1602.170-13.

(3) If, at the time of the rate reconciliation, the subscription rates are found to be lower than the equivalent rates for the lower of the two SSSGs, the Carrier may include an adjustment to the Federal group's rates for the next contract period.

(4) If, at the time of the rate reconciliation, the subscription rates are found to be higher than the equivalent rates for the lower of the two SSSGs, the Carrier shall reimburse the Fund, for example, by reducing the FEHB rates for the next contract term to reflect the difference between the estimated rates and the rates which

are derived using the methodology of the lower rated SSSG.

(5) No upward adjustment in the rate established for this contract will be allowed or considered by the Government or will be made by the Carrier in this or in any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size or composition of the FEHBP group during this contract period.

(6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

(c) *Exception for the 3-Year DoD Demonstration Project (10 U.S.C. 1108).* Similarly sized subscriber group (SSSG) rating methodologies shall not be used to determine the reasonableness of the Carrier's demonstration project premium rates. The Carrier's rates shall not be adjusted for equivalency with SSSG rating methodologies. The Carrier shall benchmark premiums against adjusted community rates if available, Medigap offerings, or other similar products.

(End of Clause)

SECTION 3.3
RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (JAN 2000) (FEHBAR 1652.215-70)

(a) If any rate established in connection with this contract was increased because (1) the Carrier--submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not complete, accurate, or current as certified in the Certificate of Accurate Cost or Pricing Data (FEHBAR 1615.804-70); (2) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not accurate as represented in the rate proposal documents; (3) the Carrier developed FEHBP rates with a rating methodology and structure inconsistent with that used to develop rates for similarly sized subscriber groups (see FEHBAR §1602.170-13) as certified in the Certificate of Accurate Cost or Pricing Data for Community Rated Carriers; or (4) the Carrier submitted or kept in its files in support of the FEHBP rate, data or information of any description that were not complete, accurate, and current--then, the rate shall be reduced in the amount by which the price was increased because of the defective data or information.

(b)(1) If the Contracting Officer determines under paragraph (a) of this clause that a price or cost reduction should be made, the Carrier agrees not to raise the following matters as a defense: (i) The Carrier was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current cost or pricing data had been submitted or maintained and identified.

(ii) The Contracting Officer should have known that the cost or pricing data in issue were defective even though the Carrier took no affirmative action to bring the character of the data to the attention of the Contracting Officer.

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract.

(iv) The Carrier did not submit or keep in its files a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (b)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if--

(A) The Carrier certifies to the Contracting Officer that, to the best of the Carrier's knowledge and belief, the Carrier is entitled to the offset in the amount requested; and

(B) The Carrier proves that the cost or pricing data were available before the date of agreement on the price of the contract (or price of the modification) and that the data were not submitted before such date.

(ii) An offset shall not be allowed if—

(A) The understated data was known by the Carrier to be understated when the Certificate of Current Cost or Pricing Data was signed; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the date of agreement on price.

(c) When the Contracting Officer determines that the rates shall be reduced and the Government is thereby entitled to a refund, the Carrier shall be liable to and shall pay the FEHB Fund at the time the overpayment is repaid--

(1) Simple interest on the amount of the overpayment from the date the overpayment was paid from the FEHB Fund to the Carrier until the date the overcharge is liquidated. In calculating the amount of interest due, the Carrier shall use the quarterly rate determinations by the Secretary of the Treasury under the authority of 26 U.S.C. 6621(a)(2) applicable to the periods the overcharge was retained by the Carrier shall be used; and,

(2) A penalty equal to the amount of overpayment, if the Carrier knowingly submitted cost or pricing data which was incomplete, inaccurate, or noncurrent.

(d) _Exception for the DoD Demonstration Project._ Similarly sized subscriber group (SSSG) rating methodologies shall not be used to determine the reasonableness of the Carrier's demonstration project premium rates. The Carrier's rates shall not be adjusted for equivalency with SSSG rating methodologies. The Carrier shall benchmark premiums against adjusted community rates if available, Medigap offerings, or other similar products.

(End of Clause)

SECTION 3.4
CONTRACTOR RECORDS RETENTION
(JAN 1999) (FEHBAR 1652.204-70)

Notwithstanding the provisions of Section 5.7 (FAR 52.215-2(f)) *Audit and Records - Negotiation* the Carrier shall retain and make available all records applicable to a contract term that support the annual statement of operations and, for contracts that exceed the threshold at FAR 15.403-4(a)(1), the rate submission for that contract term for a period of 5 years after the end of the contract term to which the records relate, except that individual enrollee and/or patient claim records shall be maintained for 3 years after the end of the contract term to which the claim records relate.

SECTION 3.5
APPROVAL FOR ASSIGNMENT OF CLAIMS
(JAN 1991) (FEHBAR 1652.232-73)

(a) Notwithstanding the provisions of Section 5.35 [FAR 52.232-23], *Assignment of Claims*, the Carrier shall not make any assignment under the Assignment of Claims Act without the prior written approval of the Contracting Officer.

(b) Unless a different period is specified in the Contracting Officer's written approval, an assignment shall be in force only for a period of one year from the date of the Contracting Officer's approval. However, assignments may be renewed upon their expiration.

SECTION 3.6
DISCREPANCIES BETWEEN ENROLLMENT AND PAYMENTS TO CARRIER (JAN 1999)

(a) The OPM and the Carrier recognize that the portion of subscription payments under Section 3.1(a) forwarded by OPM to the Carrier for Enrollees may not be consistent with the Carrier's reconciliation of enrollment under Section 1.5. Therefore, the OPM and the Carrier agree:

(1) That any individual discrepancies discovered in the course of reconciliation, in which the agency certifying officer and the Carrier agree as to the enrollment status of the individual, shall be corrected by the applicable agency to reflect the valid enrollment(s). If the reconciliation indicates that the subscription payments were not made or were made in error, appropriate adjustments shall be made by the agency to the Fund pursuant to law. Any adjustment in the subscription charges received by the Fund from the agency as a result of a reconciliation shall be forwarded by OPM under Section 3.1(a); and

(2) That the rates in Appendix B include an adjustment to the subscription charges equal to one percent in full resolution of all discrepancies not corrected under Section 3.6(b)(1).

(b) In consideration of the adjustments in Section 3.6(a)(1) and (2), the Carrier accepts the adjustment to the subscription charges in full resolution of all obligations of the Government in connection with the subscription payments as described in this section 3.6, and waives any rights it may have to claims for subscription payments under Section 3.1(a).

(c) The OPM and the Carrier shall review the reconciliation process and this provision for Contract Year 2001.

SECTION 3.7
SURVEY CHARGES (JAN 2000)

(a) If the Carrier participates in an FEHB annual consumer assessment survey, it shall pay OPM's contractor a pro rata share of the total cost of consolidating and reporting the survey results to OPM. The Carrier shall pay a separate fee for each plan option and /or rating area. The Carrier agrees to pay the contractor's invoice within 30 days of the billing date. If the Carrier does not remit payment to the contractor within 60 days of the billing date, OPM shall withhold the amount due from the Carrier's subscription charges according to FEHBAR 1652.232-70, Payments–community-rated contracts, and forward payment to the contractor.

(b) Costs incurred by the Carrier for contracting with a vendor to conduct the survey shall be the Carrier's responsibility.

PART IV -- SPECIAL PROVISIONS

SECTION 4.1
ALTERATIONS IN CONTRACT (JAN 1998)
(FAR 52.252.4)

Portions of this contract are altered as follows:

(a) Sections 5.30, 5.31, 5.32. Cost Accounting Standards, part 30 of the FAR, has not yet been implemented for the FEHBP community rated contracts. Sections 5.30, 5.31 and 5.32 are not applicable to this contract.

(b) Section 3.2. As required by Public Law 101-508, § 8909 of title 5, U.S.C., and Section 3.2(b) of this contract are amended by the following:

(1) No tax, fee, or other monetary payment may be imposed, directly or indirectly, on a Carrier or an underwriting or plan administration subcontractor of an approved health benefits plan by any State, the District of Columbia, or the Commonwealth of Puerto Rico, or by any political subdivision or other governmental authority thereof, with respect to any payment made from the Fund.

(2) Paragraph (1) shall not be construed to exempt any Carrier or subcontractor of an approved health benefits plan from the imposition, payment, or collection of a tax, fee, or other monetary payment on the net income or profit accruing to or realized by such Carrier or underwriting or plan administration subcontractor from business conducted under this Chapter, if that tax, fee, or payment is applicable to a broad range of business activity.

(c) For carriers participating in the DoD Demonstration Project only:

PARTICIPATION IN DoD/FEHBP
DEMONSTRATION PROJECT
(JAN 2000)

(a) The Carrier shall participate in the DoD/FEHBP Demonstration Project authorized by 10 U.S.C. 1108 ("DoD Demonstration Project") under the terms and conditions specified by OPM.

(b) In setting the premium rate, the Carrier shall comply with the requirements in Section 3.2, Accounting and Price Adjustment (FEHBAR 1652.216-70), and 3.3, Rate Reduction for Defective Pricing or Defective Cost or Pricing Data (FEHBAR 1652.215-70).

(c) If the Carrier has experienced costs far in excess of the premiums for the DoD enrollment group, OPM will reimburse the Carrier first from the Carrier's demonstration project Contingency Reserve and then from OPM's Administrative Reserve. At the end of the demonstration project, any surplus will be placed in the Contingency Reserve of all carriers continuing in the FEHB Program following the termination of the DoD demonstration project. Credit will be in proportion to the amount of subscription charges paid and accrued to the carriers' plan during the final year of the demonstration project.

(d) The Carrier shall compile, maintain, and, when requested by OPM, report data on the plan's experience to produce reports containing the following information and analysis:

(1) The number of eligible beneficiaries who elect to participate in the demonstration project.

(2) The number of eligible beneficiaries who elected to participate in the demonstration project and did not have Medicare Part B coverage before electing to participate.

(3) The costs of health benefits charges and the costs (direct and indirect) of administering the benefits and services provided to eligible beneficiaries who elect to participate in the demonstration project as compared to similarly situated enrollees in the FEHB Program.

(4) Prescription drug costs for demonstration project beneficiaries.

## PART V - REQUIRED CLAUSES

SECTION 5.1
DEFINITIONS (OCT 1995) (FAR 52.202-1)

(a) "Head of the agency" (also called "agency head") or "Secretary" means the Secretary (or Attorney General, Administrator, Governor, Chairperson, or other chief official, as appropriate) of the agency; and the term "authorized representative" means any person, persons, or board (other than the Contracting Officer) authorized to act for the head of the agency or Secretary.

(b) Commercial component means any component that is a commercial item.

(c) Commercial item means–

(1) Any item, other than real property, that is of a type customarily used for nongovernmental purposes and that--

(i) Has been sold, leased, or licensed to the general public; or

(ii) Has been offered for sale, lease, or license to the general public;

(2) Any item that evolved from an item described in paragraph (c)(1) of this clause through advances in technology or performance and that is not yet available in the commercial marketplace, but will be available in the commercial marketplace in time to satisfy the delivery requirements under a Government solicitation;

(3) Any item that would satisfy a criterion expressed in paragraphs (c)(1) or (c)(2) of this clause, but for--

(i) Modifications of a type customarily available in the commercial marketplace; or

(ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. "Minor" modifications means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. Factors to be considered in determining whether a modification is minor include the value and size of the modification and the comparative value and size of the final product. Dollar values and percentages may be used as guideposts, but are not conclusive evidence that a modification is minor;

(4) Any combination of items meeting the requirements of paragraphs (c)(1), (2), (3), or (5) of this clause that are of a type customarily combined and sold in combination to the general public;

(5) Installation services, maintenance services, repair services, training services, and other services if such services are procured for support of an item referred to in paragraphs (c)(1), (2), (3), or (4) of this clause, and if the source of such services--

(i) Offers such services to the general public and the Federal Government contemporaneously and under similar terms and conditions; and

(ii) Offers to use the same work force for providing the Federal Government with such services as the source uses for providing such services to the general public;

(6) Services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed under standard commercial terms and conditions. This does not include services that are sold based on hourly rates without an established catalog or market price for a specific service performed;

(7) Any item, combination of items, or service referred to in subparagraphs (c)(1) through (c)(6), notwithstanding the fact that the item, combination of items, or service is transferred between or among separate divisions, subsidiaries, or affiliates of a Contractor; or

(8) A nondevelopmental item, if the procuring agency determines the item was developed exclusively at private expense and sold in substantial quantities, on a competitive basis, to multiple State and local Governments.

(d) Component means any item supplied to the Federal Government as part of an end tem or of another component.

(e) Nondevelopmental item means--

(1) Any previously developed item of supply used exclusively for governmental purposes by a Federal agency, a State or local government,

(CR-2000)

or a foreign government with which the United States has a mutual defense cooperation agreement;

(2) Any item described in paragraph (e)(1) of this definition that requires only minor modification or modifications of a type customarily available in the commercial marketplace in order to meet the requirements of the procuring department or agency; or

(3) Any item of supply being produced that does not meet the requirements of paragraph (e)(1) or (e)(2) solely because the item is not yet in use.

(f) "Contracting Officer" means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer.

(g) Except as otherwise provided in this contract, the term "subcontracts" includes, but is not limited to, purchase orders and changes and modifications to purchase orders under this contract.

SECTION 5.2
[RESERVED]

SECTION 5.3
GRATUITIES (APR 1984) (FAR 52.203-3)

(a) The right of the Contractor to proceed may be terminated by written notice if, after notice and hearing, the agency head or a designee determines that the Contractor, its agent, or another representative -

(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

(2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

(b) The facts supporting this determination may be reviewed by any court having lawful jurisdiction.

(c) If this contract is terminated under paragraph (a) above, the Government is entitled --(1) To pursue the same remedies as in a breach of the contract; and (2) In addition to any other damages provided by law, to exemplary damages of not less than 3 nor more than 10 times the cost incurred by the Contractor in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph (c)(2) is applicable only if this contract uses money appropriated to the Department of Defense.)

(d) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

SECTION 5.4
COVENANT AGAINST CONTINGENT FEES (APR 1984) (FAR 52.203-5)

(a) The Contractor warrants that no person or agency has been employed or retained to solicit or obtain this contract upon an agreement or understanding for a contingent fee, except a bona fide employee or agency. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or, in its discretion, to deduct from the contract price or consideration, or otherwise recover, the full amount of the contingent fee.

(b) "Bona fide agency," as used in this clause, means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

"Bona fide employee," as used in this clause, means a person, employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds out as being able to obtain any Government contract or contracts through improper influence.

"Contingent fee", as used in this clause, means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

"Improper influence," as used in this clause, means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.

SECTION 5.5
ANTI-KICKBACK PROCEDURES (JUL 1995) (FAR 52.203-7)

(a) *Definitions*.

"Kickback," as used in this clause, means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime Contractor, prime Contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

"Person," as used in this clause, means a corporation, partnership, business association of any kind, trust, joint-stock company, or individual.

"Prime contract," as used in this clause, means a contract or contractual action entered into by the United States for the purpose of obtaining supplies, materials, equipment, or services of any kind.

"Prime Contractor," as used in this clause, means a person who has entered into a prime contract with the United States.

"Prime Contractor employee," as used in this clause, means any officer, partner, employee, or agent of a prime Contractor.

"Subcontract," as used in this clause, means a contract or contractual action entered into by a prime Contractor or subcontractor for the purpose of obtaining supplies, materials, equipment, or services of any kind under a prime contract.

"Subcontractor," as used in this clause, (1) means any person, other than the prime Contractor, who offers to furnish or furnishes any supplies, materials, equipment, or services of any kind under a prime contract or a subcontract entered into in connection with such prime contract, and (2) includes any person who offers to furnish or furnishes general supplies to the prime Contractor or a higher tier subcontractor.

"Subcontractor employee," as used in this clause, means any officer, partner, employee, or agent of a subcontractor.

(b) The Anti-Kickback Act of 1986 (41 U.S.C. 51-58) (the Act), prohibits any person from --

(1) Providing or attempting to provide or offering to provide any kickback;

(2) Soliciting, accepting, or attempting to accept any kickback; or

(3) Including, directly or indirectly, the amount of any kickback in the contract price charged by a prime Contractor to the United States or in the contract price charged by a subcontractor to a prime Contractor or higher tier subcontractor.

(c)(1) The Contractor shall have in place and follow reasonable procedures designed to prevent and detect possible violations described in paragraph (b) of this clause in its own operations and direct business relationships.

(2) When the Contractor has reasonable grounds to believe that a violation described in paragraph (b) of this clause may have occurred, the Contractor shall promptly report in writing the possible violation. Such reports shall be made to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Department of Justice.

(3) The Contractor shall cooperate fully with any Federal agency investigating a possible violation described in paragraph (b) of this clause.

(4) The Contracting Officer may (i) offset the amount of the kickback against any monies owed by the United States under the rime contract and/or (ii) direct that the Prime Contractor withhold, from sums owed a subcontractor under the prime contract, the amount of any kickback. The Contracting Officer may order the monies withheld under subdivision (c)(4)(ii) of this clause be paid over to the Government unless the Government has already offset those monies under subdivision (c)(4)(i) of this clause. In either case, the Prime Contractor shall notify the Contracting Officer when the monies are withheld.

(5) The Contractor agrees to incorporate the substance of this clause, including this subparagraph (c)(5) but excepting subparagraph

(c)(1), in all subcontracts under this contract which exceed $100,000.

SECTION 5.6
[RESERVED]

SECTION 5.7
AUDIT AND RECORDS-NEGOTIATION (JUN 1999) (FAR 52.215-2)

(a) As used in this clause, "records" includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) *Examination of costs.* If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

(c) *Cost or pricing data.* If the Contractor has been required to submit cost or pricing data in connection with any pricing action relating to this contract, the Contracting Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to--

(1) The proposal for the contract, subcontract, or modification;

(2) The discussions conducted on the proposal(s), including those related to negotiating;

(3) Pricing of the contract, subcontract, or modification; or

(4) Performance of the contract, subcontract or modification.

(d) *Comptroller General* -- (1) The Comptroller General of the United States, or an authorized representative, shall have access to and the right to examine any of the Contractor's directly pertinent records involving transactions related to this contract or a subcontract hereunder.

(2) This paragraph may not be construed to require the Contractor or subcontractor to create or maintain any record that the Contractor or subcontractor does not maintain in the ordinary course of business or pursuant to a provision of law.

(e) *Reports.* If the Contractor is required to furnish cost, funding, or performance reports, the Contracting Officer or an authorized representative of the Contracting Officer shall have the right to examine and audit the supporting records and materials, for the purpose of evaluating-- (1) The effectiveness of the Contractor's policies and procedures to produce data compatible with the objectives of these reports and (2) The data reported.

(f) *Availability.* The Contractor shall make available at its office at all reasonable times the records, materials, and other evidence described in paragraphs (a), (b), (c), (d), and (e) of this clause, for examination, audit, or reproduction, until 3 years after final payment under this contract or for any shorter period specified in Subpart 4.7, Contractor Records Retention, of the Federal Acquisition Regulation (FAR), or for any longer period required by statute or by other clauses of this contract. In addition--(1) If this contract is completely or partially terminated, the Contractor shall make available the records relating to the work terminated until 3 years after any resulting final termination settlement; and (2) The Contractor shall make available records relating to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to this contract until such appeals, litigation, or claims are finally resolved.

(g) The Contractor shall insert a clause containing all the terms of this clause, including this paragraph (g), in all subcontracts under this contract that exceed the simplified acquisition threshold and--

(1) That are cost-reimbursement, incentive, time-and-materials, labor-hour, or price-redeterminable type or any combination of these;

(2) For which cost or pricing data are required; or

(3) That require the subcontractor to furnish reports as discussed in paragraph (e) of this clause.

The clause may be altered only as necessary to identify properly the contracting parties and the Contracting Officer under the Government prime contract.

SECTIONS 5.8 THRU 5.13
[RESERVED]

SECTION 5.14
UTILIZATION OF SMALL BUSINESS CONCERNS (OCT 1999) (FAR 52.219-8)

(a) It is the policy of the United States that small business concerns, HUBZone small usiness concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women shall have the maximum practicable opportunity to participate in performing contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems. It is further the policy of the United States that its prime contractors establish procedures to ensure the timely payment of amounts due pursuant to the terms of their subcontracts with small business concerns, HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women.

(b) The Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with efficient contract performance. The Contractor further agrees to cooperate in any studies or surveys as may be conducted by the United States Small Business Administration or the awarding agency of the United States as may be necessary to determine the extent of the Contractor's compliance with this clause.

(c) *Definitions.* As used in this contract—

(1) "Small business concern" means a small business as defined pursuant to section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto.

(2) "HUBZone small business concern" means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Bujsiness Administration.

(3) "Small business concern owned and controlled by socially and economically disadvantaged individuals" and "small disadvantaged business concern" mean a small business concern that represents, as part of its offer that —

(i) It has received certification as a small disadvantaged business concern consistent with 13 CFR 124, Subpart B;

(ii) No material change in disadvantaged ownership and control has occurred since its certification;

(iii) Where the concern is owned by one or more individuals, the net worth of each individual upon whom the certification is based does not exceed $750,000 after taking into account the applicable exclusions set forth at 13 CFR 124.104(c)(2); and

(iv) It is identified, on the date of its representation, as a certified small disadvantaged business in the database maintained by the Small Business Administration (PRO-Net).

(d) Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as either a small business concern, a HUBZone small business concern, a small business concern owned and controlled by socially and economically disadvantaged individuals, or a small business concern owned and controlled by women.

SECTION 5.15 THRU 5.16
[RESERVED]

SECTION 5.17
CONVICT LABOR (AUG 1996) (FAR 52.222-3)

The Contractor agrees not to employ in the performance of this contract any person undergoing a sentence of imprisonment which has been imposed by any court of a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern

Mariana Islands, or the Trust Territory of the Pacific Islands. This limitation, however, shall not prohibit the employment by the Contractor in the performance of this contract of persons on parole or probation to work at paid employment during the term of their sentence or persons who have been pardoned or who have served their terms. Nor shall it prohibit the employment by the Contractor in the performance of this contract of persons confined for violation of the laws of any of the States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern MarianaIslands, or the Trust Territory of the Pacific Islands who are authorized to work at paid employment in the community under the laws of such jurisdiction, if-

(a)(1) The worker is paid or is in an approved work training program on a voluntary basis;

(2) Representatives of local union central bodies or similar labor union organizations have been consulted;

(3) Such paid employment will not result in the displacement of employed workers, or be applied in skills, crafts, or trades in which there is a surplus of available gainful labor in the locality, or impair existing contracts for services; and

(4) The rates of pay and other conditions of employment will not be less than those paid or provided for work of a similar nature in the locality in which the work is being performed; and

(b) The Attorney General of the United States has certified that the work-release laws or regulations of the jurisdiction involved are in conformity with the requirements of Executive Order 11755, as amended by Executive Orders 12608 and 12943.

SECTION 5.18
CONTRACT WORK HOURS AND SAFETY STANDARDS ACT - OVERTIME COMPENSATION (JUL 1995) (FAR 52.222-4)

(a) *Overtime requirements.* No Contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics (see Federal Acquisition Regulation (FAR) 22.300) shall require or permit any such laborers or mechanics in any workweek in which the individual is employed on such work to work in excess of 40 hours in such workweek unless such laborer or mechanic receives compensation at a rate not less than 1½ times the basic rate of pay for all hours worked in excess of 40 hours in such workweek.

(b) *Violation; liability for unpaid wages; liquidated damages.* In the event of any violation of the provisions set forth in paragraph (a) of this clause, the Contractor and any subcontractor responsible therefor shall be liable for the unpaid wages. In addition, such Contractor and subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such District or to such territory), for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanics employed in violation of the provisions set forth in paragraph (a) of this clause in the sum of $10 for each calendar day on which such individual was required or permitted to work in excess of the standard workweek of 40 hours without payment of the overtime wages required by provisions set forth in paragraph (a) of this clause.

(c) *Withholding for unpaid wages and liquidated damages.* The Contracting Officer shall upon his or her own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld, from any moneys payable on account of work performed by the Contractor or subcontractor under any such contract or any other Federal contract with the same Prime Contractor, or any other Federally-assisted contract subject to the Contract Work Hours and Safety Standards Act which is held by the same Prime Contractor, such sums as may be determined to be necessary to satisfy any liabilities of such Contractor or subcontractor for unpaid wages and liquidated damages as provided in the provisions set forth in paragraph (b) of this clause.

(d) *Payrolls and basic records.* (1) The Contractor or subcontractor shall maintain payrolls and basic payroll records during the course of contract work and shall preserve them

for a period of 3 years from the completion of the contract for all laborers and mechanics working on the contract. Such records shall contain the name and address of each such employee, social security number, correct classifications, hourly rates of wages paid, daily and weekly number of hours worked, deductions made, and actual wages paid. Nothing in this paragraph shall require the duplication of records required to be maintained for construction work by Department of Labor regulations at 29 CFR 5.5(a)(3) implementing the Davis-Bacon Act.

(2) The records to be maintained under paragraph (d)(1) of this clause shall be made available by the Contractor or subcontractor for inspection, copying, or transcription by authorized representatives of the Contracting Officer or the Department of Labor. The Contractor or subcontractor shall permit such representatives to interview employees during working hours on the job.

(e) *Subcontracts*. The Contractor or subcontractor shall insert in any subcontracts exceeding $100,000 the provisions set forth in paragraphs (a) through (e) of this clause and also a clause requiring the subcontractors to include these provisions in any lower tier subcontracts. The Prime Contractor shall be responsible for compliance by any subcontractor or lower tier subcontractor with the provisions set forth in paragraphs (a) through (e) of this clause.

SECTION 5.19
EQUAL OPPORTUNITY (FEB 1999) (FAR 52.222-26)

(a) If, during any 12-month period (including the 12 months preceding the award of this contract), the Contractor has been or is awarded nonexempt Federal contracts and/or subcontracts that have an aggregate value in excess of $10,000, the Contractor shall comply with subparagraphs (b)(1) through (11) of this clause. Upon request, the Contractor shall provide information necessary to determine the applicability of this clause.

(b) During performance of this contract, the Contractor agrees as follows:

(1) The Contractor shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. However, it shall not be a violation of this clause for the Contractor to extend a publicly announced preference in employment to Indians living on or near an Indian reservation, in connection with employment opportunities on or near an Indian reservation, as permitted by 41 CFR 60-1.5.

(2) The Contractor shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. This shall include, but not be limited to--

(i) Employment;
(ii) Upgrading;
(iii) Demotion;
(iv) Transfer;
(v) Recruitment or recruitment advertising;
(vi) Layoff or termination;
(vii) Rates of pay or other forms of compensation; and
(viii) Selection for training, including apprenticeship.

(3) The Contractor shall post in conspicuous places available to employees and applicants for employment the notices to be provided by the Contracting Officer that explain this clause.

(4) The Contractor shall, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

(5) The Contractor shall send, to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, the notice to be provided by the Contracting Officer advising the labor union or workers' representative of the Contractor's commitments under this clause, and post copies of the notice in conspicuous places available to employees and applicants for employment.

(6) The Contractor shall comply with Executive Order 11246, as amended, and the rules, regulations, and orders of the Secretary of Labor.

(7) The Contractor shall furnish to the contracting agency all information required by