An advertisement shall not directly or indirectly make unfair or incomplete comparisons of policies or benefits or comparisons of non-comparable policies of other insurers, and shall not disparage competitors, their policies, services or business methods, and shall not disparage or unfairly minimize competing methods of marketing insurance.

A. An advertisement shall not contain statements such as "no red tape" or "here is all you do to receive benefits."

B. Advertisements that state or imply that competing insurance coverages customarily contain certain exceptions, reductions or limitations not contained in the advertised policies are prohibited unless the exceptions, reductions or limitations are contained in a substantial majority of the competing coverages.

C. Advertisements that state or imply that an insurer's premiums are lower or that its loss ratios are higher because its organizational structure differs from that of competing insurers are prohibited.

> **Drafting Note:** The regulation prohibits disparaging, unfair or incomplete comparisons of policies or benefits that would have a tendency to deceive or mislead the public. The regulation does not preclude the use of comparisons by health maintenance organizations, prepaid health plans and other direct service organizations that describe the difference between their prepaid health benefits coverage and indemnity insurance coverage.

## Section 13. Jurisdictional Licensing and Status of Insurer

A. An advertisement that is intended to be seen or heard beyond the limits of the jurisdiction in which the insurer is licensed shall not imply licensing beyond those limits.

> **Drafting Note:** This regulation prohibits advertisements that imply that an insurer is licensed beyond the limits of those jurisdictions where it is actually licensed. An advertisement that contains testimonials from persons who reside in a state in which the insurer is not licensed or that refers to claims of persons residing in states in which the insurer is not licensed implies licensing in those states and therefore is in violation of this regulation unless the advertisement states that the insurer is not licensed in those states.

B. An advertisement shall not create the impression directly or indirectly that the insurer, its financial condition or status, or the payment of its claims, or the merits, desirability, or advisability of its policy forms or kinds or plans of insurance are approved, endorsed or accredited by any division or agency of this state or the federal government. Terms such as "official" or words of similar import, used to describe any policy or application form are prohibited because of the potential for deceiving or misleading the public.

> **Drafting Note:** Although the regulation permits a reference to an insurer being licensed in a state where the advertisement appears, it does not allow exaggeration of the fact of the licensing nor does it permit the suggestion that competing insurers may not be so licensed because, in most states, an insurer must be licensed in the state to which it directs its advertising.

© 1999 National Association of Insurance Commissioners

C. An advertisement shall not imply that approval, endorsement or accreditation of policy forms or advertising has been granted by any division or agency of the state or federal government. Approval of either policy forms or advertising shall not be used by an insurer to imply or state that a governmental agency has endorsed or recommended the insurer, its policies, advertising or its financial condition.

**Section 14. Identity of Insurer**

A. The name of the actual insurer shall be stated in all of its advertisements. The form number or numbers of the policy advertised shall be stated in an advertisement that is an invitation to contract. An advertisement shall not use a trade name, an insurance group designation, name of the parent company of the insurer, name of a particular division of the insurer, service mark, slogan, symbol or other device that without disclosing the name of the actual insurer, would have the capacity and tendency to mislead or deceive as to the true identity of the insurer.

> **Drafting Note:** The regulation recognizes the existence of holding companies. The requirement that the advertisement refer to the policy form number is applicable only to advertisements of individual and franchise policies that are invitations to contract.

B. An advertisement shall not use any combination of words, symbols, or physical materials that by their content, phraseology, shape, color or other characteristics are so similar to combination of words, symbols or physical materials used by agencies of the federal government or of this state, or otherwise appear to be of such a nature that it tends to confuse or mislead prospective insureds into believing that the solicitation is in some manner connected with an agency of the municipal, state or federal government.

C. Advertisements, envelopes or stationery that employ words, letters, initials, symbols or other devices that are similar to those used in governmental agencies or by other insurers are not permitted if they may lead the public to believe:

(1) That the advertised coverages are somehow provided by or are endorsed by the governmental agencies or the other insurers;

(2) That the advertiser is the same as is connected with or is endorsed by the governmental agencies or the other insurers.

D. An advertisement shall not use the name of a state or political subdivision of a state in a policy name or description.

E. An advertisement in the form of envelopes or stationery of any kind may not use any name, service mark, slogan, symbol or any device in a manner that implies that the insurer or the policy

© 1999 National Association of Insurance Commissioners

advertised, or that any agent who may call upon the consumer in response to the advertisement, is connected with a governmental agency, such as the Social Security Administration.

F. An advertisement may not incorporate the word "Medicare" in the title of the plan or policy being advertised unless, wherever it appears, the word is qualified by language differentiating it from Medicare. The advertisement, however, shall not use the phrase "[ ] Medicare Department of the [ ] Insurance Company," or language of similar import.

G. An advertisement may not imply that the reader may lose a right or privilege or benefit under federal, state or local law if he or she fails to respond to the advertisement.

H. The use of letters, initials or symbols of the corporate name or trademark that would have the tendency or capacity to mislead or deceive the public as to the true identity of the insurer is prohibited unless the true, correct and complete name of the insurer is in close conjunction and in the same size type as the letters, initials or symbols of the corporate name or trademark.

I. The use of the name of an agency or "[ ] Underwriters" or "[ ] Plan" in type, size and location so as to have the capacity and tendency to mislead or deceive as to the true identity of the insurer is prohibited.

J. The use of an address so as to mislead or deceive as to true identity of the insurer, its location or licensing status is prohibited.

K. An insurer shall not use, in the trade name of its insurance policy, any terminology or words so similar to the name of a governmental agency or governmental program as to have the tendency to confuse, deceive or mislead the prospective purchaser.

L. Advertisements used by agents, producers, brokers or solicitors of an insurer shall have prior written approval of the insurer before they may be used.

M. An agent who makes contact with a consumer, as a result of acquiring that consumer's name from a lead-generating device, shall disclose that fact in the initial contact with the consumer. An agent or insurer may not use names produced from lead-generating devices that do not comply with the requirements of this regulation.

**Section 15. Group or Quasi-Group Implications**

A. An advertisement of a particular policy shall not state or imply that prospective insureds become group or quasi-group members covered under a group policy and as members, enjoy special rates or underwriting privileges, unless that is the fact.

© 1999 National Association of Insurance Commissioners

B. This regulation prohibits the solicitations of a particular class, such as governmental employees, by use of advertisements which state or imply that their occupational status entitles them to reduced rates on a group or other basis when, in fact, the policy being advertised is sold only on an individual basis at regular rates.

C. Advertisements that indicate that a particular coverage or policy is exclusively for "preferred risks" or a particular segment of the population or that a particular segment of the population is an acceptable risk, when the distinctions are not maintained in the issuance of policies, are prohibited.

D. An advertisement to join an association, trust or discretionary group that is also an invitation to contract for insurance coverage shall clearly disclose that the applicant will be purchasing both membership in the association, trust or discretionary group and insurance coverage. The insurer shall solicit insurance coverage on a separate and distinct application that requires a separate signature. The separate and distinct applications required need not be on separate documents or contained in a separate mailing. The insurance program shall be presented so as not to conceal the fact that the prospective members are purchasing insurance as well as applying for membership, if that is the case. Similarly, it is prohibited to use terms such as "enroll" or "join" to imply group or blanket insurance coverage when that is not the fact.

E. Advertisements for group or franchise group plans that provide a common benefit or a common combination of benefits shall not imply that the insurance coverage is tailored or designed specifically for that group, unless that is the fact.

> **Drafting Note:** The regulation prohibits the use of representations to any segment of the population that a particular policy or coverage is available only to that or similar segments of the population as preferred risks when actually the policy or coverage is available to members of the public at large at the same rates. For example, the regulation prohibits an advertisement labeled "Now for Readers of X Magazine."

**Section 16. Introductory, Initial or Special Offers**

A.(1) An advertisement of an individual policy shall not directly or by implication represent that a contract or combination of contracts is an introductory, initial or special offer, or that applicants will receive substantial advantages not available at a later date, or that the offer is available only to a specified group of individuals, unless that is the fact. An advertisement shall not contain phrases describing an enrollment period as "special," "limited," or similar words or phrases when the insurer uses the enrollment periods as the usual method of marketing accident and sickness insurance.

(2) An enrollment period during which a particular insurance product may be purchased on an individual basis shall not be offered within this state unless there has been a lapse of not less than [insert number] months between the close of the immediately preceding enrollment period for the same product and the opening of the new enrollment period. The advertisement shall indicate the

© 1999 National Association of Insurance Commissioners

date by which the applicant must mail the application, which shall be not less than ten (10) days and not more than forty (40) days from the date that the enrollment period is advertised for the first time. This regulation applies to all advertising media, i.e., mail, newspapers, the Internet, radio, television, magazines and periodicals, by any one insurer. It is inapplicable to solicitations of employees or members of a particular group or association that otherwise would be eligible under specific provisions of the Insurance Code for group, blanket or franchise insurance. The phrase "any one insurer" includes all the affiliated companies of a group of insurance companies under common management or control.

**Drafting Note:** The regulation restricts the repetitive use of enrollment periods. The requirement of reasonable closing dates and waiting periods between enrollment periods was adopted to eliminate abuses that formerly existed. The regulation does not limit just the use of enrollment periods. It requires that a particular insurance product offered in an enrollment period through any advertising media, including the prepared presentations of agents, cannot be offered again in the entire state until a specified number of months from the close of the enrollment period have expired. Thus, an insurer must choose whether to use enrollment periods or open enrollment for a product. (See Paragraph (4) for a definition of "a particular insurance product."). The regulation does not prohibit multiple advertising during an enrollment period through any and all media published or transmitted within this state as long as the enrollment periods for all the advertisements have the same expiration date.

The regulation does not prohibit the solicitation of members of a group or association for the same product even though there has not been a lapse of a specified number of months since the close of a preceding enrollment period that was open to the general public for the same product. The regulation does not require separation by a specified number of months of enrollment periods for the same insurance product in this state if the advertising material is directed by an admitted insurer to persons by direct solicitation on the basis that a common relationship exists with an entity, such as a bank and its depositors, a department store to its charge account customers or an oil company to its credit card holders, and more than one of the organizations is sponsoring the insurance product at different times if providing the insurance under this method is not otherwise prohibited by law. However, the [insert number] month regulation does apply to one specific sponsor to the same person in this state on the basis of his or her status as a customer of that one specific entity only.

The number of months was left open in this regulation because several states permit six months; several states allow three months, and other states prohibit certain periods of enrollment. Whether the enrollment periods should be permissible and the period of time between enrollments are items on which each state should make its decision on an individual basis and each state should modify the time limit in this regulation to comply with state law.

(3) This regulation prohibits any statement or implication to the effect that only a specific number of policies will be sold, or that a time is fixed for the discontinuance of the sale of the particular policy advertised because of special advantages available in the policy, unless that is the fact.

(4) The phrase "a particular insurance product" in Paragraph (2) of this subsection means an insurance policy that provides substantially different benefits than those contained in any other policy. Different terms of renewability; an increase or decrease in the dollar amounts of benefits; an increase or decrease in any elimination period or waiting period from those available during

© 1999 National Association of Insurance Commissioners

an enrollment period for another policy shall not be sufficient to constitute the product being offered as a different product eligible for concurrent or overlapping enrollment periods.

**Drafting Note:** This regulation defines the meaning of "a particular insurance product" and prohibits advertising of products having minor variations, such as different elimination periods or different amounts of daily hospital indemnity benefits, in a succession of enrollment periods.

B. An advertisement shall not offer a policy that utilizes a reduced initial premium rate in a manner that overemphasizes the availability and the amount of the initial reduced premium. When an insurer charges an initial premium that differs in amount from the amount of the renewal premium payable on the same mode, the advertisement shall not display the amount of the reduced initial premium either more frequently or more prominently than the renewal premium, and both the initial reduced premium and the renewal premium must be stated in juxtaposition in each portion of the advertisement where the initial reduced premium appears.

**Drafting Note:** Some states prohibit a reduced initial premium. Section 16B does not imply that the states that prohibit an initial premium are not in conformity with the model regulation. This is an item to be decided on a state-by-state basis.

C. Special awards, such as a "safe drivers' award," shall not be used in connection with advertisements of accident and sickness insurance.

## Section 17. Statements about an Insurer

An advertisement shall not contain statements that are untrue in fact, or by implication misleading, with respect to the assets, corporate structure, financial standing, age or relative position of the insurer in the insurance business. An advertisement shall not contain a recommendation by any commercial rating system unless it clearly indicates the purpose of the recommendation and the limitations of the scope and extent of the recommendations.

**Drafting Note:** This is closely related to the requirements of Section 10 concerning the use of statistics. The regulation prohibits insurers that have been organized for only a brief period of time advertising that they are "old" and also prohibits the use of images of a "home office" building in a manner that is misleading with respect to the actual size and magnitude of the insurer. Also, the occupations of the persons comprising the insurer's board of directors or the public's familiarity with their names or reputations are irrelevant and must not be emphasized. The preponderance of a particular occupation or profession among the board of directors of an insurer does not justify the advertisement of a plan of insurance offered to the general public as insurance designed or recommended by members of that occupation or profession. For example, it is prohibited for an insurance company to advertise a policy offered to the general public as "the physician's policy" or "the doctor's plan" simply because there is a preponderance of physicians on the board of directors of the insurer. The regulation prohibits the use of a recommendation of a commercial rating system unless the purpose, meaning and limitations of the recommendation are clearly indicated.

## Section 18. Enforcement Procedures

© 1999 National Association of Insurance Commissioners

A. Advertising File. Each insurer shall maintain at its home or principal office a complete file containing every printed, published or prepared advertisement of its individual policies and typical printed, published or prepared advertisements of its blanket, franchise and group policies hereafter disseminated in this or any other state, whether or not licensed in an other state, with a notation attached to each advertisement that indicates the manner and extent of distribution and the form number of any policy advertised. The file shall be subject to regular and periodical inspection by the commissioner. All of these advertisements shall be maintained in a file for a period of either four (4) years or until the filing of the next regular report on examination of the insurer, whichever is the longer period of time.

B. Certificate of Compliance. Each insurer required to file an annual statement shall file with the commissioner, with its annual statement, a certificate of compliance executed by an authorized officer of the insurer that states that, to the best of the officer's knowledge, information and belief, the advertisements that were disseminated by the insurer during the preceding statement year complied or were made to comply in all respects with the provisions of this regulation and the insurance laws of this state as implemented and interpreted by this regulation.

> **Drafting Note:** Where the regulation was adopted on other than January 1 of the year, the required certification that all advertisements used in the preceding annual statement year complied with the regulation cannot be given. The respective insurance departments should consider remedying the problem in the Certificate of Compliance used for the calendar year in which the regulation was adopted.

## Section 19. Severability Provision

If any section or portion of a section of this regulation, or its applicability to any person or circumstance is held invalid by a court, the remainder of the regulation, or the applicability of the provision to other persons or circumstances, shall not be affected.

## Section 20. Filing for Prior Review

The commissioner may, at his or her discretion, require filing of any accident and sickness insurance advertising material for review prior to use.. The advertising material shall be filed by the insurer with the commissioner not less than thirty (30) days prior to the date the insurer desires to use the advertisement.

> **Drafting Note:** This is an example of a regulation that may be used at the option of the commissioner in a state that elects to review advertisements prior to use. The NAIC takes no position on the question of whether advertising material should be subject to prior review by the commissioner.

---

*Legislative History (all references are to the Proceedings of the NAIC)*

*1956 Proc. I 127, 130, 131-137, 148 (adopted)*

© 1999 National Association of Insurance Commissioners

*1956 Proc. II 270, 301, 315 (interpretive guidelines established).*
*1957 Proc. I 76, 89-90, 99 (amended).*
*1972 Proc. I 15, 16, 555, 557, 563-580 (amended and reprinted).*
*1973 Proc. I 9, 11, 141, 224, 244-250 (amended and reprinted).*
*1973 Proc. II 18, 21, 370, 436, 438-442 (historical notes revised).*
*1974 Proc. II 8, 10, 380, 419, 420-441 (amended and reprinted).*
*1989 Proc. I 24-25, 702, 706-726 (amended and reprinted).*
*1998 Proc. 4th Quarter (amended and reprinted).*

© 1999 National Association of Insurance Commissioners

# APPENDIX E

## ORDER OF BENEFIT DETERMINATION RULES

**Model Regulation Service--January 1996**
**National Association of Insurance Commissioners**

# APPENDIX E

## ORDER OF BENEFIT DETERMINATION RULES

Model Regulation Service--January 1996
National Association of Insurance Commissioners

When two or more plans pay benefits, the rules for determining the order of payment are as follows:

A. The primary plan pays or provides its benefits as if the secondary plan or plans did not exist.

B. A plan that does not contain a coordination of benefits provision that is consistent with this regulation is always primary. There is one exception: coverage that is obtained by virtue of membership in a group that is designed to supplement a part of a basic package of benefits may provide that the supplementary coverage shall be excess to any other parts of the plan provided by the contract holder. Examples of these types of situations are major medical coverages that are superimposed over base plan hospital and surgical benefits, and insurance type coverages that are written in connection with a closed panel plan to provide out-of-network benefits.

C. A plan may consider the benefits paid or provided by another plan in determining its benefits only when it is secondary to that other plan.

D. The first of the following rules that describes which plan pays its benefits before another plan is the rule to use.

(1) Non-Dependent or Dependent. The plan that covers the person other than as a dependent, for example as an employee, member, subscriber or retiree is primary and the plan that covers the person as a dependent is secondary. However, if the person is a Medicare beneficiary and, as a result of federal law, Medicare is secondary to the plan covering the person as a dependent; and primary to the plan covering the person as other than a dependent (e.g., a retired employee); then the order of benefits between the two plans is reversed so that the plan covering the person as an employee, member, subscriber or retiree is secondary and the other plan is primary.

(2) Child Covered Under More Than One Plan. The order of benefits when a child is covered by more than one plan is:

(a) The primary plan is the plan of the parent whose birthday is earlier in the year if:

- The parents are married;
- The parents are not separated (whether or not they ever have been married); or
- A court decree awards joint custody without specifying that one party has the responsibility to provide health care coverage.

If both parents have the same birthday, the plan that covered either of the parents longer is primary.

(b) If the specific terms of the court decree state that one of the parents is responsible for the child's health care expenses or health care coverage and the plan of that parent has actual knowledge of those terms, that plan is primary. This rule applies to claim determination periods or plan years commencing after the plan is given notice of the court decree.

(c) If the parents are not married, or are separated (whether or not they ever have been married) or are divorced, the order of benefits is:

- The plan of the custodial parent
- The plan of the spouse of the custodial parent;
- The plan of the non-custodial parent; and then
- The plan of the spouse of the non-custodial parent.

(3) Active or inactive employee. The plan that covers a person as an employee who is neither laid off nor retired, is primary. The same would hold true if a person is a dependent of a person covered as a retiree and an employee. If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored. Coverage provided an individual as a retired worker and as a dependent of an actively working spouse will be determined under the rule labeled B(1).

(4) Continuation coverage. If a person whose coverage is provided under a right of continuation provided by federal or state law also is covered under another plan, the plan covering the person as an employee, member, subscriber or retiree (or as that person's dependent) is primary, and the continuation coverage is secondary. If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

(5) Longer or shorter length of coverage. The plan that covered the person as an employee, member, subscriber or retiree longer is primary.

(6) If the preceding rules do not determine the primary plan, the allowable expenses shall be shared equally between the plans meeting the following definition of plan, for purposes of order of benefits determination. In addition, this plan will not pay more than it would have paid had it been primary.

(a) A "plan" is any of the following that provides benefits or services for medical or dental care or treatment. However, if separate contracts are used to provide coordinated coverage for members of a group, the separate contracts are considered parts of the same plan and there is no COB among those separate contracts.

(*i*) "Plan" includes: group insurance, closed panel or other forms of group or group-type coverage (whether insured or uninsured); hospital indemnity benefits in excess of $200 per day; medical care components of group long-term care contracts, such as skilled nursing care; medical benefits under group or individual automobile contracts; and Medicare or other governmental benefits, as permitted by law.

(*ii*) "Plan" does not include: individual or family insurance; closed panel or other individual coverage (except for group-type coverage); amounts of hospital indemnity insurance of $200 or less per day; school accident type coverage, benefits for non-medical components of group long-term care policies; Medicare supplement policies, Medicaid policies and coverage under other governmental plans, unless permitted by law.

Each contract for coverage under (*i*) or (*ii*) is a separate plan. If a plan has two parts and COB rules apply only to one of the two, each of the parts is treated as a separate plan.

Texas Health Choice

Ms. Eliza Shivers
Office of Personnel Management
1900 E Street
Room 3451
N.W. Washington DC 20415

February 2, 2000

Dear Eliza,

Thank you for bringing the brochure errors to my attention. I am very sorry that any errors occurred in the revision and printing of the 2000 Federal brochure. Every effort was made during the proofing process to identify any errors and make the necessary corrections before printing. Per your memo, I am confirming the correct numbers as follows:

- The correct Texas Health Choice Federal Employees brochure number is RI 73-063.
- The correct Texas Health Choice Contract number is CS 1894.

I have made the corrections on the master document that will be used as the basis for the revisions for 2001. I regret if this error has caused any confusion or dissatisfaction with our plan. Please let me know if I can be of any further service to you.

Sincerely,

Christine Simpson

Christine Simpson
Compliance Specialist



Texas Health Choice, L.C. • Northpointe II • 9330 Amberton Parkway • Dallas, TX 75243
Phone: (972) 458-5000

Texas Health Choice

# Texas Health Choice, L.C.

**2000**

Formerly HMO Texas, L.C.

A Health Maintenance Organization




**Serving:** Dallas and Fort Worth Areas;
Houston and Golden Triangle Areas

Enrollment in this Plan is limited; see pages 5-8 for requirements.
For changes in benefits see pages 3-5.

**Enrollment code:**

**UK1 Self only**
**UK2 Self and family**

Region includes the Dallas/Fort Worth areas

**Enrollment code:**

**2T1 Self only**
**2T2 Self and family**

Region includes the Greater Houston/Golden Triangle areas

Visit the OPM website at http://www.opm.gov/insure
and
This Plan's website at http://www.sierrahealth.com

Authorized for distribution by the:

**United State Office of Personal Management Retirement and Insurance Service**

Federal Employees Health Benefits Program

RI 73-658

## Table of Contents

| | Page |
|---|---|
| Introduction | 1 |
| Plain language | 1 |
| How to use this brochure | 2 |
| Section 1. Health Maintenance Organizations | 3 |
| Section 2. How we change for 2000 | 3 |
| Section 3. How to get benefits | 5 |
| Section 4. What to do if we deny your claim or request for service | 9 |
| Section 5. Benefits | 11 |
| Section 6. General exclusions – Things we don't cover | 21 |
| Section 7. Limitations – Rules that affect your benefits | 21 |
| Section 8. FEHB facts | 22 |
| Department of Defense/FEHB Demonstration Project | 26 |
| Inspector General Advisory: Stop Healthcare Fraud! | 28 |
| Summary of benefits | Inside back cover |
| Premiums | Back cover |

## Introduction

Texas Health Choice, L.C.
9330 Amberton Parkway
Dallas, Tx 75243

Texas Health Choice, L.C.
11011 Richmond, Suite 900
Houston, Texas 77042

This brochure describes the benefits you can receive from Texas Health Choice under its contract with the Office of Personnel Management (OPM), as authorized by the Federal Employees Health Benefits (FEHB) law. This brochure is the official statement of benefits on which you can rely. A person enrolled in this Plan is entitled to the benefits described in this brochure. If you are enrolled for Self and Family coverage, each eligible family member is also entitled to these benefits.

OPM negotiates benefits and premiums with each plan annually. Benefit changes are effective January 1, 2000, and are shown on pages 3-5. Premiums are listed at the end of this brochure.

## Plain language

The President and Vice President are making the Government's communication more responsive, accessible, and understandable to the public by requiring agencies to use plain language. Health Plan representatives and Office of Personnel Management staff have worked cooperatively to make portions of this brochure clearer. In it you will find common, everyday words, except for necessary technical terms; "you" and other personal pronouns; active voice; and short sentences.

We refer to Texas Health Choice as "this Plan" throughout this brochure even though in other legal documents, you will see a plan referred to as a carrier.

These changes do not affect the benefits or services we provide. We have rewritten this brochure only to make it more understandable.

We have not re-written the benefits section of this brochure, but some of your benefits have changed in the year 2000. You will find new benefit description language next year.

## How to use this brochure

This brochure has eight sections. Each section has important information you should read. If you want to compare this Plan's benefits with benefits from other FEHB plans, you will find that the brochures have the same format and similar information to make comparisons easier.

1. Health Maintenance Organizations (HMO). This Plan is an HMO. Turn to this section for a brief description of HMOs and how they work.

2. How we change for 2000. If you are a current member and want to see how we have changed, read this section.

3. How to get benefits. Make sure you read this section; it tells you how to get services and how we operate.

4. What to do if we deny your claim or request for service. This section tells you what to do if you disagree with our decision not to pay for your claim or to deny your request for a service.

5. Benefits. Look here to see the benefits we will provide as well as specific exclusions and limitations. You will also find information about non-FEHB benefits.

6. General exclusions – Things we don't cover. Look here to see benefits that we will not provide.

7. Limitations – Rules that affect your benefits. This section describes limits that can affect your benefits.

8. FEHB facts. Read this for information about the Federal Employees Health Benefits (FEHB) Program.

## Section 1. Health Maintenance Organizations

Health maintenance organizations (HMOs) are health plans that require you to see Plan providers: specific physicians, hospitals and other providers that contract with us. These providers coordinate your health care services. The care you receive includes preventative care such as routine office visits, physical exams, well-baby care and shots, as well as treatment for illness and injury.

When you receive services from our providers, you will not have to submit claim forms or pay bills. However, when you receive services you must pay copayments and coinsurance listed in this brochure. When you receive emergency services you may have to submit claim forms.

You should join an HMO because you prefer the plan's benefits, not because a particular provider is available. You cannot change plans because a provider leaves our Plan. We cannot guarantee that any one physician, hospital, or other provider will be available and/or remain under contract with us. Our providers follow generally accepted medical practice when prescribing any course of treatment.

## Section 2. How we change for 2000

**Program-wide changes**

To keep your premium as low as possible, OPM has set a minimum copay of $10 for all primary care office visits.

This year, you have a right to more information about this Plan, care management, our networks, facilities, and providers.

If you have a chronic or disabling condition, and your provider leaves the Plan at our request, you may continue to see your specialist for up to 90 days. If your provider leaves the Plan and you are in the second or third trimester of pregnancy, you may be able to continue seeing your OB/GYN until the end of your postpartum care. You have similar rights if this Plan leaves the FEHB program.

You may review and obtain copies of your medical records on request. You may ask that a physician amend a record that is not accurate, relevant, or complete. If the physician does not amend your record, you may add a brief statement to the record.

If you are over age 50, all FEHB plans will cover a screening sigmoidoscopy every five years. This screening is for colorectal cancer.

**Changes to the Dallas Plan**

- The out-of-pocket maximum was $1,500 per individual and $3,900 per family, but it has decreased to $600 per individual and $1,200 per family.
- The oral surgical services benefit has been improved and now includes coverage for treatment required to stabilize sound natural teeth, the jawbones, or surrounding tissues after an Accidental Injury when the treatment is initiated within the first ten (10) days. This includes, but is not limited to, coverage for the following: incision and drainage, excision of broken sound and natural teeth, or tooth stabilization through splinting.
- Short-term *inpatient* rehabilitation services were covered at no charge for physical therapy and 20% of charges for chronic pain management, speech therapy and occupational therapy, but now each therapy will be covered at no charge, limited to two months or 30 visits, whichever is greater, per medical episode.
- Short-term *outpatient* rehabilitation services were covered at $5 a visit for physical therapy and 20% of charges for chronic pain management, speech therapy, and occupational therapy, but now each therapy will be covered at $10 a visit, limited to two months or 30 visits, whichever is greater, per medical episode.
- The benefits for hospice services have been clarified and now include the following: no charge for inpatient hospice care, $10 for bereavement counseling up to 5 visits or $500, whichever is less, and no charge for inpatient and outpatient respite care. The limitation on bereavement services is a year 2000 addition.

## Section 2. How we change for 2000 *continued*

**Changes to the Dallas Plan** *continued*

- The urgent care facility copay has increased from $5 a visit to $25 a visit.
- The *outpatient* mental health benefit was $20 a visit up to 30 visits per year, but the coverage has improved to $20 a visit for individual therapy and $10 a visit for group therapy with a combined calendar year maximum of 40 visits.
- The *inpatient* calendar year benefit maximum for treatment of substance abuse has decreased from 45 days to 30 days.
- The *outpatient* calendar year benefit maximum for treatment of substance abuse has decreased from unlimited visits to 40 visits.
- The copay for generic prescription drugs has decreased from $10 to $6.
- The copay for brand-name prescription drugs has increased from $10 to $12.
- The mail-order drug copay will remain at two times the generic or brand-name copay. However, the supply will be increased from a 60 day supply to a 90 day supply.
- Non-formulary drugs were covered at the appropriate generic or brand-name copay if the member's provider specified that no substitutions were permitted for the written prescriptions. Now, the non-formulary drug copay has changed to 50% of charges for any non-formulary drug regardless of whether substitutions are permitted.
- Injectable and internally-implanted time-release medications, except Norplant, were covered at $5, times the number of months the medication was to be effective, not to exceed $200. This benefit has changed so that you will now simply pay the appropriate generic or brand-name copay depending on the medication prescribed.

**Changes to the Houston Plan**

- The point-of-service benefit is no longer available.
- The sterilization benefit was no charge. Now there is a charge of $75 for a vasectomy and $200 for a tubal ligation.
- Diagnosis and treatment of infertility was covered at $10 a visit. Now copays have increased to 50% of charges per visit.
- Previously, we did not provide coverage for infertility drugs. Now we will provide coverage with a copay of 50% of charges.
- The Skilled Nursing Facility benefit was unlimited. Now it will have a 100 days per calendar year limit.
- The substance abuse outpatient lifetime maximum has been eliminated.
- Durable medical equipment was covered with a 30% copay. Now the copay has been lowered to 20% of charges.
- Orthotic and prosthetic devices were covered at no charge. Now the copay has increased to 20% of charges.
- The copay for self-management education and training of diabetics has increased from no charge to $10 a visit.
- The copay for brand-name drugs has decreased from $15 to $12.
- Injectable and time-released medications, except Norplant, were covered same as any other drug without a benefit limit. Now they are covered at the appropriate generic or brand-name copay times the number of months the medication will be effective, not to exceed $200.
- The copay for erectile dysfunction drugs has increased from the appropriate generic or brand-name copay to 50% of charges.
- The dental prophylaxis (cleaning) benefit copay has decreased from $20 a visit to $10 a visit.
- The dental bitewing X-ray benefit copay has decreased from $10 a visit to no charge.
- The dental complete series X-ray benefit copay has decreased from $25 a visit to no charge when reasonable and necessary for dental diagnosis and treatment.
- A dental emergency oral exam benefit has been added with a $15 copay per visit inside the service area and $25 copay per visit outside the service area.
- A discount of 15% has been added for additional dental services not covered.

## Section 2. How we change for 2000 *continued*

**Changes to the Houston Plan** *continued*

- A vision benefit has been added to the core medical plan and taken out of the non-FEHBP benefit. The old plan offered discounts only. Now, the core vision plan exam is $10 a visit and the glasses, frames and contact lenses are 20% of charges.

**Non-FEHBP benefits:**
**A Medicare prepaid enrollment plan has been added.**

## Section 3. How to get benefits

**What is this Plan's service area?**

To enroll with us, you must live or work in our service area. This is where our providers practice.

Our service area is comprised of the following full counties in North Central Texas:

Collin, Dallas, Denton, Ellis, Hood, Hunt, Johnson, Kaufman, Parker, Rockwall, Tarrant, and Wise.

Our service area is comprised of the following full counties in the Houston and Golden Triangle Areas:

Austin, Brazoria, Chambers, Colorado, Fort Bend, Galveston, Grimes, Harding, Harris, Jefferson, Liberty, Matagorda, Montgomery, Orange, San Jacinto, Waller and Wharton

Ordinarily, you must get your care from providers who contract with us. If you receive care outside our service area, we will pay only for emergency care. We will not pay for any other health care services.

If you or a covered family member travels frequently or lives away from home part of the year, you should be aware that benefits for care outside the service area are restricted to emergency care and care received at contracting providers in other areas of the continental United States. Contact the Plan for further details on services available from providers that have a contractual arrangement with Texas Health Choice, L.C., or an affiliate organization.

If you or a covered family member move outside of our service area, you can enroll in another plan. If your dependents live out of the area (for example, if your child goes to college in another state), you should consider enrolling in a fee-for-service plan or an HMO that has agreements with affiliates in other areas. If you or a family member move, you do not have to wait until Open Season to change plans. Contact your employing or retirement office.

**How much do I pay for services?**

You must share the cost of some services. This is called either a copayment (a set dollar amount) or coinsurance (a set percent of charges). Please remember you must pay this amount when you receive services, except for the following services: prenatal care, routine immunizations and boosters from birth to 6 years of age, laboratory and X-ray services, complex diagnostic services, physician house calls, home health care, inpatient hospital services, inpatient surgical services, anesthesia, outpatient surgical services, short-term inpatient rehabilitation services, skilled nursing facility care, inpatient hospice care, respite care, inpatient mental health services, inpatient substance abuse services, transplant services, and diabetic supplies.

After **you pay** $600 in copayments or coinsurance for one family member, or $1,200 for two or more family members, you do not have to make any further payments for certain services for the rest of the year. This is called a catastrophic limit. However, copayments or coinsurance for your prescription drugs and dental services do not count toward these limits and you must continue to make these payments.

Be sure to keep accurate records of your copayments and coinsurance, since you are responsible for informing us when you reach the limits.